UNITED STATES COURT OF APPEALS

FOR THE SEVENTH CIRCUIT

F I L E D

SEP 1 0 2008

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

CHARLES O. EUBANKS,

      Petitioner Appellate,

)
)
)
)
)
)
)
)
)

v.

UNITED STATES OF AMERICA,

      Respondent Appellant.

Case No. 07-CR-500598-1

Judge Presiding:

Honorable Judge Philip G. Reinhard

---

PETITION FOR MANDAMUS PURSUANT TO

FED. R. CIV. PROC. RULE 21

AND

FED. R. CIV. PROC. RULE 65 (b)(1)(A)

---

    NOW COMES, CHARLES O. EUBANKS, Petitioner-Appellate in aid of the Constitution in the above entitled action, moves this Honorable Court of Appeals pursuant to Fed. R. Civ. Proc. Rule 21 and Fed. R. Civ. Proc. Rule 65 (b)(1)(A). Where District Court Judge denied Appellate access to the Court when he failed to adjudicate the following;

(1) The District Court failed to order a Psychiatric and mental
    evaluation, when it was established that petitioner-appellate

had been under prescribed medication his entire adolescant
life, since the age of seven years old, when his condition
A.D.H.D. (Attention Deficit Hyperactivity Disorder) was made
known to the Disrict Court. See Court records, where District
Court Judge made a minute inquiry at the plea colloquy, and
never followed up or issued a order for a mental evaluation
for determination purposes and to protect Appellates Constitu-
tional Rights. See Exhibit-A  (Timothy's Law).

(2) The District Court to this date has forced ineffective assistance
of cousel upon Appellate, against his will. See Exhibit-B Motion
to Withdraw Counsel.

(3) Petitioner-Appellate, petitions this Honorable Court of Appeal
to adjudicate Appellates following motion(s), in accordance with
the United States Constitution and Laws thereof. See Exhibit-C
Motion to Withdraw Plea; See Exhibit-D Motion to Supplement the
Motion to Withdraw Plea pursuant to Fed. R. Crim. Proc. 12(b)(2);
See Exhibit-E Motion for Appointment of Independent Investigator;
See Exhibit-F Amicus Curaie Motion and Courts Order stricking
Amicus Curaie Motion from the record; See Exhibit-G Court Order
stricking Motion for Independent Investigator from the record
due to Appellate-petitioner being represented by counsel after
Petitioner-Appellate had filed Motion to Withdraw Counsel.
See Exhibit-H Motion to Show Cause; See Exhibit-I Motion for
Judicial Notice pursuant to Fed. R. Evid. Rule 201(d) and Title
28 U.S.C. § 1331; See Exhibit-J Motion for First Amendment
Petition pursuant to the United States Constitution, Amendment I.

WHEREFORE, for the reasons stated above Appellate ask this Honorable Court of Appeals to order the District Court to adjudicate all the issues outlined in the aforementioned petition.and issue a Temporary Restraining order until the above matter is resolved and Appellate-Petitioners Constitutional Rights are protected, where he may have access to the Court on the Constitutional Issues and said Court may adjudicate therefrom and apply a de novo review of the entire record in Case No. 07-CR-50058-1. I So Pray.

RESPECTFULLY SUBMITTED

CHARLES O. EUBANKS Appellate

## CERTIFICATE OF SERVICE

I, CHARLES O. EUBANKS, certify that I caused all copie(s) to be forwarded to the Clerk of the Court of Appeals for the Seventh Circuit, via United States Postal Service from this County Jail this_____day of_____,2008.

RESPECTFULLY SUBMITTED

CHARLES O. EUBANKS Appellate

(3)

UNITED STATES COURT OF APPEALS

FOR THE SEVENTH CIRCUIT

---

CHARLES O. EUBANKS,                          )
      Petitioner-Appellate,          )
                                            )
                                            )
                                            )   Case No. _07-CR-50058-1_
v.                                           )
                                            )   Judge Presiding:
                                            )
                                            )   Judge Philip G. Reinhard
                                            )
UNITED STATES OF AMERICA,                    )
      Respondent-Appellant.          )

---

AFFIDAVIT IN SUPPORT OF MANDAMUS

PURSUANT TO FED. R. CIV. PROC. RULE 21

---

I, CHARLES O. EUBANKS, deposes and say that I am the Affiant-Petitioner in the above entitled action and that the information contained herein is true and correct and not misleading to the best of my knowledge, swear and avers that;

1) I, CHARLES O. EUBANKS, am the Petitioner-Appellate, affiant in this cause.

2) That I am 20 years old, above the legal age.

3) That I brought to the attorney of record (David Brown)attention that I am not knowledgeable about the law.

4) The Court appointed attorney of record (David Brown) strongly encouraged and coerced me to sign the plea with the understanding

that I would receive 13 to 15 years and that if I didn't accept the plea that I would be facing 21 to 24 years.

5) That I brought to the attorney of record and the District Courts attention my long medical history.

6) At the Plea Colloquy the District Court addressed my mother (Francine J. Spears) about my medical history.

7) Since the age seven years old I been Ridilin dependent, having been diagnosed by Janet Wattles with A.D.H.D. (Attention Deficit Hyperactivity Disorder).

8) That I signed a plea of guilt under the encouragement, coercion and advice of counsel with the understanding that I could appeal my sentence.

9) That I later discovered in the signed plea that I waived to collaterally attack all appeal rights.

10) The United States Government didn't serve upon me that it established that the location where the alleged robbery offenses occurred came within the federal criminal jurisdiction pursuant to the Assimilative Crimes Act, as Land reserved or acquired for use of the United States.

11) The United States Government did not serve upon me or present no evidence confirming that it had exclusive or concurrent jurisdiction over the locations where offenses occurred in the State of Illinois, City of Rockford, County of Winnebago.

12) The United States Goverment did not serve upon me or presented no evidence that the Legislature of the State of Illinois had ceded jurisdiction of locations where alleged robbery offenses

(2)

occurred.

13) All records in Case No. 07-CR-50058-1 does not affirmatively and properly reflect that the United States Government satisfied exclusive jurisdiction (via);

        A) Powers enumerated through the United States Constitution.

        B) Title 40 U.S.C. § 3112 (previously § 255).

        C) Title 28 U.S.C. § 7 Special Territorial and Maritime Jurisdiction required by law.

14) Due to the Constitutional violations any judgment and Commitment Order will be void on its face.

15) For meritorious reasons stated in request for independent investigator, he moved to withdraw his plea.

16) He object to the schedule sentencing date of September 22, 2008, due to the above stated Constitutional violations.

Appellate-affiant swears that all stated herein has been true and correct and complete and a Temporary Restraining Order for the countless Constitutional violations, which has caused an immediate irreparable injury, loss and damage due to being forced into Federal Court against affiants will.

WHEREFORE, affiant is owed a Constitutional Protection and Statutory Right from sworn officials who are in control of his life and liberty, to prohibit such miscarriage of justice in case No. 07-CR-50058-1. Affiant further sayeth not.

RESPECTFULLY SUBMITTED

CHARLES O. EUBANKS Affiant

(3)

## DECLARATION UNDER PENALTY OF PERJURY

I, CHARLES O. EUBANKS, hereby declare under Penalty of Perjury that the aforementioned (Affidavit in Support of Mandamus Petition) is true and correct to the best of my knowledge and understanding. See Title 28 U.S.C. § 1746 and Title 18 U.S.C. § 1621.

RESPECTFULLY SUBMITTED

CHARLES O. EUBANKS Appellate
Ogle County Jail
P.O. Box 217
Oregon, IL 61061

(4)

Tim

(S)
ExhiBit A





**Timothy**
May 5, 1988 – March 16, 2001

# Timothy's Law

## Bill Numbers

Assembly    Senate
8601        5329

| Home |
|---|
| Timothy's Story |
| Family Photos |
| Talking Points |
| Equal Benefits |
| Latest News |
| Member Organizations |
| TLC Flyer |
| **Contact Your Legislators** |
| Timothy's Law Message Board |

# Timothy's Story

Seven weeks before his 13th birthday, Timothy O'Clair took his life. The youngest of three children in his Schenectady family, Timothy hung himself in his bedroom closet on March 16, 2001. Born May 5th, 1988, Timothy was much like any other boy - beginning life as an active, happy energetic baby; growing in size and interests. He loved nature, fishing, baseball, camping, bowling, and building things with his hands.

As Timothy grew, he began to exhibit some problems, beginning with attention deficit issues. At the age o seven, he was becoming easily frustrated and developing a serious temper. By his eighth birthday, his family became convinced that he needed help. His parents, brothers and his school began to recognize problems that were growing. In the spring of 1996, the school principal shared with Timothy's family an essay written by one of Tim's brothers. Although the essay said that he wanted to hurt his mother, the family believed it wa written as though it was seen through Timothy's eyes.

The family sought help and Timothy's pediatrician referred them to a psychological group in Albany County, and a psychiatrist in Saratoga County. For four years, the family worked together, as well as separately with the psychologists, keeping their family together.

Although the family's health insurance was through Mr. O'Clair's employment they quickly learned of the discrimination against mental illnesses (and chemical dependency) in coverage. Their policy's allowed only 20 outpatient visits a year for the psychiatrist and psychologist combined. While both their physical health and mental health insurance co-payments were $10 per visit initially, mental health visits became $35 each after just a few visits. The visits became very expensive, as the family quickly used up their coverage limits and began having to pay all of it themselves. Each year, they would experience the same spiraling cost trend.

When the O'Clairs *were* able to access care and services, they really believed the treatment they attained was high quality. The problem was that it was limited and sporadic, as insurance and the family budget allowed.

At the end of fourth grade, Timothy began to refuse attending school. In 1998, Timothy had his first inpatient admission at Four Winds Hospital in Saratoga after throwing rags into the family's home furnace the week before Christmas. Timothy was admitted for eight days. The insurance company stopped paying for the hospitalization, and Timothy went home.

While at Four Winds, Timothy had made an unfounded allegation of abuse by his father, which brought the family a connection with County Social Services. The family worked with DSS for two years, at one point filing PINS petitions against Timothy, to get him to go to school.

Over the years, Timothy was diagnosed with Depression, Attention Deficit Hyperactivity Disorder, and Oppositional Defiance Disorder.

In the spring of 1999, Timothy who was now in 5th grade, pushed back a school bathroom ceiling tile and climbed in for no known reason. The family continued to pursue outpatient treatment, but because of the cost,

and the need for the entire family, they couldn't go as often as necessary. With Timothy spiraling downward, the O'Clairs reached out again to County DSS. Timothy was hospitalized at Ellis hospital for a week and a half, and then Timothy went home again.

Things in the O'Clair home grew steadily worse, and the family became concerned for their safety. They needed residential care for Timothy - care that simply was not available through their health insurance.

They decided to place him in foster care. In New York State, when a child goes into foster care, they automatically become eligible for Medicaid, which will pay, at taxpayer expense, for all of the services insurance companies refuse to provide.

For a period of nine months Timothy was in shared custody. This meant that the government would decide with whom Timothy lived. It also meant the O'Clairs would pay statutory child support to Schenectady County. For six months, the O'Clairs had $226.00 taken out of every (bi-weekly paycheck.

Timothy bounced around the system - his first three days were with a foster family that the O'Clairs found completely unacceptable. After that, it was a state run temporary residence in Albany, and then a respite/foster home in Altamont. After about a month in the foster care, Timothy returned home, while the O'Clairs waited for a residential placement spot in a state program to open up. After a short while, one did - in Northeast Parent Child Society. He was there from June of 2000 until January of 2001.

He came home from Northeast on his mother's birthday. For three weeks, he did well. Although the family continued to participate with their psychiatrist at Four Winds Hospital, and their psychologist at Karner Associates, things began going downhill again.

Timothy was becoming violent again, and it all came to a head the night he died. He refused to take his medications. He broke all the trophies he had received over the years, which he'd collected in his room. He dumped all his dresser drawers and the clothes in his closet on his bedroom floor. He told his brother he'd kill himself, as he had threatened suicide many times before. The family did not know how serious he was, as he had claimed this so many times in the past.

While his father was working and his mother was out with his brother Christopher, Timothy was home with John, his oldest brother who was then 16. When Donna returned home, she found that Timothy had hung himself in his bedroom closet. Christopher helped his mother get him down, and John called 911, but Timothy was gone.

Even after his death, the family continued to pay child support to cover his stay at Northeast, and was still paying Ellis Hospital for his 3 day extended stay not covered by insurance. The family finally went to Family Court to get the child support garnishment stopped.

The family trauma and agony continues to this day. Christopher, who is now 16, is still trying to deal with the loss of his little brother, and what he witnessed that night.

John, the eldest son, is a student at St. Rose, studying to be an elementary school teacher.

Together the family lives with a haunting reality. If New York had equal coverage for mental health and substance abuse services, which would cost New Yorkers only pennies a day, Timothy might have received the treatment he needed.



# Timothy's Law

### Bill Numbers

Assembly

A801

Senate

5329

**Timothy**

May 5, 1988 – March 16, 2001

## Timothy's Law Talking Points

Home

Timothy's Story

Family Photos

Talking Points

Equal Benefits

Latest News

Member Organizations

TLC Flyer

**Contact Your Legislators**

Timothy's Law Message Board

- According to the National Institute of Mental Health, in any given year over 50 million American Adults (20% of the population) suffer from a mental disorder.
- For children, one in five have behavioral, emotional or mental health problems. Without mental health services, these problems may result in school failure, alcohol or substance abuse, family disruption, violence, or suicide.
- In New York State insurers currently limit the number of inpatient and outpatient mental health visits per year and charge higher deductibles, co-payments, and/or co-insurance for mental health and substance abuse treatment than they do for treatment of physical health services.
- Without timely access to necessary treatment families are often left with the cruel choice of depleting their financial resources and accessing only the sporadic treatment that they can afford; or relinquishing custody of their child to the state in order to access publicly funded services.

- Treatment Works. The success rate for treatment of a first episode of schizophrenia is 60%, the rate for major depression is 65% to 70%, and the success rate for treating bipolar disorder is 80%. The success rate for angioplasty (an insurance covered procedure) is only 41%.
- Treatment is cost effective. A recent actuarial study conducted by PriceWaterhouseCoopers estimates that the passage of Timothy's Law would only increase premiums by $1.26 per employee per month.
- New Yorkers overwhelmingly support parity. In a recent Zogby poll, 81% of New Yorkers said they were willing to pay the estimated $1.26 more per month for full insurance coverage for mental and chemical dependency health care needs.
- 33 states have already passed parity legislation with minimal or no premium increases.

- A recent study released by the Substance Abuse and Mental Health Services Administration (SAMHSA) estimates that full parity for mental health and substance abuse services in private health insurance plans would increase family insurance premiums less than one percent.
- A Rutgers University study commissioned by the President's Commission on Model State Drug Laws found that, "On the average, untreated alcoholics incur general health care costs that are at least 100% higher than those of non-alcoholics." After addiction treatment, days lost to illness, sickness claims and hospitalization dropped by about 50%. The researchers concluded that treatment causes sharp reductions in medical care utilization.

Special Thanks to Vision Systems for hosting this website.



# Timothy's Law

**Bill Numbers**

| Assembly | Senate |
| --- | --- |
| A8101 | 5329 |

**Timothy**
May 5, 1988 – March 16, 2001

### Equal Mental Health Benefits—
### Good For Families and Good for Business



Home

Timothy's
Story

Family Photos

Talking Points

Equal
Benefits

Latest News

Member
Organizations

TLC Flyer

**Contact
Your
Legislators**

Timothy's Law
Message
Board

**What do we mean by "equal mental health benefits"?**

Equal mental health benefits, or "parity," refers to the practice—now mandated in most states—of offering mental health benefits that are on par with other health benefits with respect to plan features such as co-payments, deductibles, annual and lifetime caps, limits on covered outpatient visits, inpatient days and maximum reimbursable fees.

**Who is helped by equal mental health benefits?**

- **Working families** covered by their employers' health insurance plans—employees, their spouses and their children, any of whom may suffer from a mental health problem.

- **Employers** whose employees are more productive when they and their families get the mental health care they need.

**Why do working families need equal mental health benefits?**

*Mental illness is far more prevalent than most people know.*

- 28-30% of adults and over 20% of children have a diagnosable mental or addictive disorder in any given year, according to the Surgeon General.[i]

- Employers who have assessed their employees' mental health needs have discovered prevalence rates such as the following: Westinghouse reported rates for major depression at 17% for women and 9% for men; Wells Fargo Bank discovered through an employee survey that 30 to 35% of respondents were experiencing depressive symptoms.[ii]

*Many working families cannot afford to pay for adequate mental health treatment when they need it, so many don't get the treatment they need when they need it.*

- 55% of privately insured individuals reported that the number one reason they did not seek mental health care was that they were worried about the cost, according to a 1998 Robert Wood Johnson Foundation study.[iii]

*Treatment works! And it's cost-effective!*

- Mental health treatment outcomes have improved dramatically in recent decades; making these illnesses as treatable as general medical conditions. [iv]

- 51% of substance abuse treatment episodes result in successful treatment completion; treatment completion is highest (73%) for treatment taking place in residential short-term and hospital settings.[v]

- Treatment efficacy rates for disorders like schizophrenia (60%), bi-polar disorder (80%), major depression (80%), panic disorder (80%) and obsessive-compulsive disorder (60%) compare favorably with many well-established medical or surgical treatments.[vi] For example, angioplasty or atherectomy, common treatments for heart disease, have success rates at or below 50%.[vii]

 50 to 70% of a physician's normal caseload consists of patients whose medical ailments are significantly related to psychological factors. If mental health care were available to these patients, it would lead to a decrease in medical utilization and generate significant cost-savings.[viii]

**What do equal mental health benefits cost?**

The experiences of states that require mental health benefits on a par with other health benefits show that health insurance premiums and plan costs generally increased by around 1% or less in the short term and decreased over the longer term.

- Increases in plan costs after the implementation of state parity laws are minimal; for example: less than 1% in Rhode Island, no increase in New Hampshire, and a .2% decrease in Maryland. [ix]

- Magellan Health Services, the nation's largest managed behavioral health organization, reports that their premium increases ranged between .2% and .8% following implementation of state mental health parity requirements.[x]

- Minnesota: Blue Cross/Blue Shield *reduced* its insurance premiums by 5 to 6% after one year's experience under the states comprehensive parity law.[xi]

- North Carolina: Mental health expenses have decreased every year since comprehensive parity for state and local employees was passed in 1992; mental health costs as a percentage of total health benefits have decreased from 6.4% in 1992 to 3.1% in 1998; since 1992, inpatient hospital days have decreased by 70%[xii]

- The Congressional Budget Office has estimated that premiums would increase by about .9% as a result of passage of the Mental Health Equitable Treatment Act of 2001[xiii]

- Introducing mental health parity in conjunction with managed care results in a 30 to 50% percent decrease in total mental health costs. In systems that are already using managed care, implementing parity results in a less than 1% increase in health care costs.[xiv]

**Why do equal mental health benefits make good business sense?**

**Because better mental health benefits actually reduce both direct and indirect costs over time.**

 Employer data show that costs associated with untreated or poorly managed mental health needs far exceed direct spending for mental health care. For example, 28% of the annual economic costs of depression in 1995 were from treatment but 72% of costs were related to absenteeism (27%), lost productivity at work (28%) and mortality costs (17%)[xv]

DuPont, Dow, Federal Express, Xerox, and other major corporations reported reduced costs of 30 to 50% over one or two years after eliminating restrictive mental coverage limits.[xvi]

 **Because untreated or under-treated mental illness eventually becomes more costly to treat and has more serious and permanent consequences for workers, their families, and their employers.**

- In 1993, the National Advisory Mental Health Council estimated the combined costs of the consequences of untreated mental illness—including costs of lost productivity, lost earnings due to illness, and mortality—and the treatment of mental illness to be $148 billion. [xvii]

- Of the ten leading causes of disability worldwide, five are psychiatric conditions: unipolar depression, alcohol use, bipolar affective disorder, schizophrenia and obsessive-compulsive disorder. [xviii] Employer plans with the highest financial access barriers to mental health services have higher psychiatric disability claim costs than plans with less restrictive arrangements.[xix]

Untreated mental health needs result in absenteeism, presenteeism (employees are at work but not unable to function productively), turnover, accidents, grievances, and impaired teamwork and leadership.

[i] U.S. Department of Health and Human Services. *Mental Health: A Report of the Surgeon General*

*Surgeon General.* Rockville, MD: U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services, Administration, Center for Mental Health Services, National Institutes of Health, National Institute of Mental Health, 1999. (This is from chapter six: "Organization and Financing of Mental Health Services".

[ii] *Published for the DEPRESSION Awareness, Recognition and Treatment (D/ART) National Worksite Program:* Veronica Vacarro. *Depression: Corporate Experiences and Innovations.* National Institute of Mental Health and the Washington Business Group on Health. Washington, D.C: 1994. (As cited in: Phyllis Gabriel & Marjo-Riitta Liimatainen. *Mental Health in the workplace.* International Labor Office. Geneva, Switzerland: 2000.)

[iii] Results of 1998 Robert Wood Johnson national household telephone survey. (As cited in: *Mental Health: A Report of the Surgeon General*)

[iv] Judge David L. Bazelon Center for Mental Health. "Policymakers Fact Sheet on the Mental Health System."

[v] Drug and Alcohol Services Information Systems. The DASIS Report. January 2003.

[vi] National Advisory Mental Health Council. *Health care reform for Americans with severe mental illnesses: report of the National Advisory Mental Health Council* 1993.

[vii] Judge David L. Bazelon Center for Mental Health. "Policymakers Fact Sheet on the Mental Health System." (http://www.bazelon.org/takeaction/legislation/campaign2000factsheet.pdf)

[viii] Gary R. VandenBos & Patrick H. DeLeon, "The Use of psychotherapy to improve physical health." Vol 25, 333-343: 1988 (As cited in: "Medical Cost Offset" by the American Psychological Association.)

[ix] Phyllis Gabriel & Marjo-Riitta Liimatainen. *Mental Health in the workplace.* International Labor Office. Geneva, Switzerland: 2000.

[x] Statement of Henry Harbin, M.D., Chairman of the Board of Magellan Health Services on behalf of the American Managed Behavioral Health Care Association and Magellan Health Services at a Hearing of the Committee on Education and the Work Force Subcommittee on Employer-Employee Relations on Accessing Mental Health Parity: Implications for Patients And Employers. Washington, D.C. March 13: 2002.

[xi] Bruce Lubotsky Levin, Ardis Hanson & Richard D.Coe. *Mental Health Parity: National and State Perspectives.* The Louis de la Parte Florida Mental Health Institute. 2001. (This is an annual report to the Florida State Legislature by The Louis de la Parte Florida Mental Health Institute.)

[xii] "Why Mental Health Parity Makes Economic Sense." National Mental Health Association. (http://www.nmha.org/state/parity/parity_economy.cfm)

[xiii] United States Congressional Budget Office. *Cost Estimate for s543, Mental Health Equitable Treatment Act of 2001.* Washington, D.C: August 22, 2001 (This report was ordered by the United States Senate Committee on Health, Education, Labor, and Pensions on August 1, 2001)

National Institutes of Health. Harold E. Varmus, M.D. "Parity in Financing Mental Health Services: Managed Care Effects on Cost, Access and Quality. An Interim Report to Congress by the National Advisory Mental Health Council." May 1998.

[xv] Part of a series of educational/training materials distributed by D/ART National Worksite Program & Washington Business Group on Health. 1995. (Cited in: Phyllis Gabriel & MarjoRiitta Liimatainen. *Mental Health in the workplace*. International Labour Office. Geneva, Switzerland: 2000.)



[xvi] Richard Frank, Tom McGuire and Joseph Newhouse. "Risk Contracts In Managed Mental Health Care." *Health Affairs*. Vol. 14. No. 3. (1995).

[xvii] National Advisory Mental Health Council. *Health Care Reform for Americans With Severe Mental Illnesses* (Cited in "Why Mental Health Parity Makes Economic Sense." National Mental Health Association.)

[xviii] Phyllis Gabriel & Marjo-Riitta Liimatainen. *Mental Health in the workplace*. International Labour Office. Geneva, Switzerland: 2000.

[xix] Mary Jane England. "Capturing Mental Health Cost Offsets". *Health Affairs*. Vol. 18. No. 2. (1999).

Prepared by The Parity Project, NAMI-New York City Metro ( 4/24/03 )
432 Park Avenue South, Suite 710, New York, NY 10016
www.naminycmetro.org 212.684.3365

Special Thanks to Vision Systems for hosting this website.

Last Updated:

Thursday, May 29, 2003 07:50 PM

By Timothy O'Clair's brother Christopher

Questions or comments about our website? E-mail our webmaster.





**Timothy**
May 5, 1988 - March 16, 2001

Timothy O'Clair was a happy and energetic baby. As a boy he loved camping, sports, animals, crafts and was learning to play music. When his parents noticed that he became easily frustrated and was having attention problems they sought mental health treatment through their private health insurance.

Over the next few years, Timothy's condition worsened. The O'Clairs had to pay high co-payments and quickly used up the visits allotted by their insurance. They paid out of pocket, which limited visits to the doctor. Eventually, the O'Clairs had to relinquish custody of Timothy to gain access to hospitalization.

In March 2001, Timothy, at the age of 12, took his own life. According to Tom and Donna O'Clair, "If Timothy had diabetes or cancer our health insurance would have provided unlimited coverage. Instead, simply by the nature of Timothy's illness, our coverage was limited... We are confident that had Timothy received the services he needed he would be here with us now."

# Timothy's Law

## New Yorkers Need Mental Health Insurance Parity

### Current Health Insurance Practices are Discriminatory and Dangerous

Mental illnesses and chemical dependency are serious illnesses that respond well to treatment. Children and adults with bipolar disorder, eating disorders, depression or substance abuse disorders can be at great risk of permanent health damage or death, without access to treatment. Most health insurance policies in New York provide only 30 hospital days or 20 doctor visits a year for mental health treatment and require high deductible and co-payments. Individuals with diabetes, asthma or heart disorders aren't limited to 30 hospital days or 20 doctor visits a year.

### Insurance Parity Keeps Families Together

Without timely access to necessary treatment, families are often left with the cruel choice of depleting their financial resources and accessing only the sporadic treatment that they can afford; or relinquishing custody of their child to the state in order to access publicly funded services. Parents with restricted benefits risk decompensation, the loss of their jobs and hospitalization, putting tremendous financial and emotional stress on their family.

### Insurance Parity is Cost Effective

A recent actuarial study estimates that passage of Timothy's Law will increase premiums by $1.26 a month. The 33 states that passed parity legislation have experienced minimal or non-existent premium increases. Black and Decker, Federal Express, IBM and other corporations have implemented parity voluntarily resulting in increased productivity and a reduction in overall health costs.

### New Yorkers Want Insurance Equality

In a recent Zogby poll, 81% of New Yorkers said they were willing to pay $1.26 more per month for full insurance coverage for mental and chemical dependency health care needs.

### Timothy's Law Campaign (TLC)

TLC has formed to advocate the enactment of legislation for parity in mental health and chemical dependency coverage in health insurance plans. The members of TLC are committed to creating a future where no family will experience the frustrations or tragedies caused by discriminatory insurance practices.

**For more information: TLC, 15 Elk Street, Albany, NY 12207 (518) 432-0333, info@ftnys.org**

# Timothy's Law Campaign
## Member Organizations

Alcohol and Substance Abuse Providers of New York State ♦ Association for Community Living ♦ Coalition of Voluntary Mental Health Agencies ♦ Ellis Hospital     Families Together in New York ♦ Family  and Children's Service of the Capital Region ♦ Medical Society of the State of New York ♦ Mental Health Association in New York State ♦ Mental Health Associations of New York City and Westchester ♦ Mental Health Empowerment Project ♦ National Alliance for the Mentally Ill of New York State ♦ National Alliance for the Mentally Ill of New York City ♦ National Association of Social Workers - New York State Chapter ♦ New York Association of Psychiatric Rehabilitation Services ♦ New York Presbyterian Hospital, Department of Psychiatry ♦ New York State Coalition for Children's Mental Health ♦ New York State Council for Community Behavioral Healthcare ♦ New York State Public Health Association ♦ New York State Psychiatric Association ♦ New York State Psychological Association ♦ New York State United Teachers ♦ Samaritans Suicide Prevention Center ♦ Schuyler Center for Analysis and Advocacy ♦ UJA Federation of New York

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| CHARLES O. EUBANKS, | ) | |
| Petitioner, | ) | |
| | ) | |
| | ) | Case No. 07-CR-50058-1 |
| v. | ) | |
| | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| Respondent. | ) | |

(5)

Exhibit -B

MOTION TO WITHDRAW COUNSEL

NOW COMES, Charles O. Eubanks, Petitioner Pro Se, in the above entitled cause, in the interest of justice and the public reputation of the judicial process, moves this Honorable Court to withdraw counsel of record for the following reasons:

(1)    Petitioner filed a formal complaint against counsel of record, August 10, 2008 with the Attorney Registration and Disciplinary Commission.

(2)    Petitioner filing of complaint against counsel of record presents a conflict of interest in case No. 07-CR-50058-1.

(3)    If Honorable Court refuse  to grant motion to withdraw counsel petitioner asked this Honorable Court to compel counsel to file all motions filed by petitioner Pro Se.

1

(4)     Petitioner contends that counsel of record representation failed below adequate representation outlined in the Sixth Amendment of the Constitution of the United States. See <u>Strickland v. Washington</u>, 466 U.S. 674 at 682 (1984).


WHEREFORE for the reasons stated above Petitioner pray that this Honorable Court grant Petitioners motion to withdraw counsel.

RESPECTFULLY SUBMITTED

<u>Charles O. Eubanks</u> Petitioner Pro Se


## CERTIFICATE OF SERVICE


I, Charles O. Eubanks, Petitioner in the above cause certify under Penalty of Perjury that the information contained in the above motion is true and correct pursuant to Title 28 U.S.C. § 1746 and Title 18 U.S.C. § 1621 and that Petitioner caused <u>all</u> copie(s) to be forwarded to the adverse parties (Motion to Withdraw Counsel) via U.S. Postal Mail Prepaid from this County Jail this_____day of _____,2008.

RESPECTFULLY SUBMITTED

<u>Charles O. Eubanks</u>


2

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

(5)

Exhibit - C

| | |
|---|---|
| CHARLES O. EUBANKS,<br>        Pro Se Defendant | ) |
| | ) |
| v. | ) Case No. 07 CR-50058-1 |
| | ) RE: <u>AFFIDAVIT IN SUPPORT OF MOTION</u> |
| | ) <u>TO WITHDRAW PLEA</u> |
| | ) |
| UNITED STATES OF AMERICA, | ) |
|         Respondant. | ) |

I, CHARLES O. EUBANKS, deposes and sayeth that I am the Affiant-Pro Se Defendant in the above entitled action and the information contained herein is true and correct and not misleading to the best of my knowledge, Avers that;

Under Rule 11(N) Pro Se Defendant CHARLES O. EUBANKS, unknowingly waived to collaterally attack my sentence on appeal, and I would like to withdraw that Plea because I believe the Court lacks Jurisdiction to impose any sentence.

1) I have a slight difficulty in understanding and communicating the things my lawyer said to me regarding the Plea.

2) my attorney didn't intelligently inform me of  all direct consequences of the Plea, where I understood fully.

3) I unknowingly sign the plea without having full knowledge that I also were waiving <u>all</u> my  appeal rights, I was told by my attorney that I was only waiving my trial rights, had I known with full knowledge that I was waiving my appeal rights I would of never

(1)

signed Plea.

4) that the United States Government did not establish that the location where the offenses occurred came within Federal Criminal Jurisdiction under the Assimilative Crimes Act, as Land Reserved or Acquired for use of the United States.

5) that the United States Government presented absolutely no evidence confirming they had exclusive or concurrent jurisdiction over the locations where the offenses occurred in the State of Illinois, City of Rockford, County of Winnebago.

6) that the United States Government presented no evidence that the Legislature of the State of Illinois had ceded jurisdiction of the locations where offenses occurred.

7) that the record in case number 07 CR-50058-1 does not affirmatively and properly reflect that the United States Government satisfied exclusive jurisdiction (via);

(1) Powers enumerated through the United States Constitution;

(2) Title 40 U.S.C.S. § 3112 (previously § 255);

(3) Title 18 U.S.C. § 7, Special Territorial and Maritime Jurisdiction as required by law.

8) my signing of the Plea was involuntary due in part that my attorney never explained fully the commerce clause and how it relates to my case, all he was concerned with was getting me to sign the Plea. Had I known intelligently and been fully informed of Congresse(s) Intent regarding Interstate Commerce I would of Never signed the Plea.


WHEREFORE the reasons stated above I respectfully pray that this Honorable Court withdraw the Plea that was unintelligently, unknowingly,

and involuntarily signed as so described above.

## DECLARATION UNDER PENALTY OF PERJURY

I, CHARLES O. EUBANKS, declare under penalty of perjury that
I am the Pro Se Defendant in this matter, that I have read this
motion (Affidavit and Motion to Withdraw Plea) and that the information
in the above motion(s) is true and correct. See Title 28 U.S.C. §
1746 and Title 18 U.S.C. § 1621.

Affiant Sayeth Not

_____
CHARLES O. EUBANKS

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

---

CHARLES O. EUBANKS,       )

      Pro Se Defendant, )

                 )    Case No. 07 CR - 50058-1 _____

                 )

v.                 )

                 )

                 )

UNITED STATES OF AMERICA,  )

      Respondant.  )

---

MOTION TO WITHDRAW PLEA

---

NOW COMES, Charles O. Eubanks, Pro Se Defendant in the above entitled cause, in the interest of justice and the public reputation of the judicial process, moves this Honorable Court for permission to withdraw the Plea Agreement which was unintelligently signed _____, 2008.

The reason for this motion to withdraw the entered plea of guilty is due in part that the District Court lacks jurisdiction of law to impose a sentence under Title 18 U.S.C. § 1951(a) and pursuant to Rule 11 (N), I involuntarily and unknowingly waived to collaterally attack my sentence on appeal, where I believed that I was only waiving my right to go to trial, not waiving all my appeal right(s).

This entire criminal matter began as violation of Class X felonies pursuant to Illinois Statute 720 ILCS 5/18-2,where Pro Se

Defendant Charles O. Eubanks was indicted _____,2007 and
subsequently arrested pursuant to Illinois Statute 720 ILCS 5/18-2.
Ultimately the State of Illinois allowed the Federal Government to
disrupt the Constitutional guaranteed right(s) outlined in the 5th
and 6th Amendments (Due Process and the Right to a Fair Trial) in
that proceeding's absent an authority of law in violation of Title
40 U.S.C.S. § 3112 previously § 255, where there were no indication
of acceptance of jurisdiction on behalf of the Federal Government
by filing a notice of acceptance with the Legislative Body of the
State of Illinois regarding this matter. There is no presumption
in favor of and the basis for jurisdiction once challenged must be
affirmatively shown. Hanford v. Davis, 163 U.S. 273, 16 S. Ct. 10551,
14 L.Ed. 157 1896)(Lack of jurisdiction cannot be waived); Glidden v.
Zdanok, 370 U.S. 530, 535-537 (1962).

The Federal Government must first establish Special Maritime
and Territorial Jurisdiction of the United States, defined in Title
18 U.S.C. § 7 of the Federal Rules of Criminal Procedure, or Title
40 U.S.C.S. § 3112 (previously § 255), for the United States District
Court to allow the Federal Government to exercise jurisdiction over
offenses occurring "without" the United States, without first esta-
blishing Title 18 U.S.C. § 7 and/or Title 40 U.S.C.S. § 3112, which
is an abuse of authority which was not delegated to the United States
by the Constitution nor The People.

What Law governs? What constitutes interstate commerce is a
federal question controlled by decisions of the United State Supreme
Court, neither legislature nor the Courts of any state can define
what is or is not such a burden upon interstate commerce as to co-
nstitute a violation of the Commerce Clause. Ingalls Iron Works Co.

v. Birmingham, 248 Ala. 417, 27 SO 2d. 788 (1946).

Whether commerce is interstate and subject to the regulatory
powers of Congress or intrastate and subject to state control, should
be determined from it's essential character. Consolidated Edison Co.
of New York v. N.L.R.B., 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126
3 LR.R.M. (BNA) 645 1 Lab Case (CCH) ¶17038 (1938); Watker v. Vermont
Parole Bd., 157 Vt. 72, 196 A 2d 1277 (1991).

In a Criminal Prosecution where the Federal Government is the
moving party, it must not only prove ownership of the property upon
which the crime was committed but it must also produce documentation
that the State had ceded that property as well as jurisdiction to
it thereby waiving all State jurisdiction over said property.
The United State Supreme Court has addressed this issue and held
that:

> "where lands are acquired without consent the poss-
> ession of the United States, uless political juris-
> diction be ceded to them in some way, is simply
> that of an ordinary proprietor."

Adams v. United States,319 U.S., 312, 63 S.Ct., 87 L.Ed. 1421 (1943).
See ALSO United v. Grant, 318 F. Supp. 2d 1042 (D. Mont 2004).

"No jurisdiction exist in the Federal United States to enforce
Criminal Laws within any State until consent to accept jurisdiction
over acquired lands has been filed on behalf, and in behalf of the
United States as provided in Title 40 U.S.C.S. § 3112 (previously
§ 255), as private law of district, and the fact that the State
authorized the Federal Government to take jurisdiction is immaterial."
Adams Supra; United States v. King, 781 F. Supp. 315 (D. N.J. 1991)

Pursuant to 15A Am Jur § 9; However a "but-for" casual chain
from an activity to aggregate impact of every attenuated effect may
not justify allowing Federal Regulation of activity which is truly

local and the Commerce Clause may not be used to completely obliterate the Constitutions distinction between National and Local authority. U.S. v. Morrison, 120 S.Ct. 1740, 144 Ed. Law Rep. 28, 82 Fair Empl. Prac. Cas. (BNA) 1313 (U.S. 2000); Gilbert v. Babbit, 2000 WL 726073 (4th Cir. 2000); Allied Local & Regional Mfrs. Caucus v. U.S. E.P.A., 2000 WL 737750 (D.C. 2000)(Congress may not regulate noneconomic, violent criminal conduct based solely on that conducts aggregate effect on interstate commerce).

Therefore, Federal Jurisdiction is lacking giving the fact that the State of Illinois authorized the Federal Government to interrupt  the Due Process Proceedings within the State of Illinois unconstitutionally by way of it's Assistant United States Attorney's actions is immaterial based on the fact that jurisdiction was not properly ceded and accepted as prescribed by the Constitution and by  law.

Pursuant to 15A Am Jur § 14. nor may concurrent powers of federal/ state to regulate commerce be enlarged or diminished by the exercise or nonexercise of State Power. U.S. v. Darby, 312 U.S. 100, 312 U.S. 657, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430 (1941); U.S. v. Lopez, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed. 2d 626, 99 Ed. Law Rep 24 (1995)

It is clearly evident in each of the instances that the Federal Government has listed; with respect to the mentioning of the business names, what was reportedly robbed in those businesse(s), included with the dates the reported robberies occurred, has failed to show a nexus in those specific robberies to those businesse(s), and how acts obstructed, delayed, and effected commerce and the movements of articles and commodities in commerce as defined in Title 18 U.S.C. § 1951(a).

Pursuant to 15A Am Jur § 16. The regulatory power of Congress over interstate and foreign commerce does not attach until such intercourse begins and ceases when interstate and foreign commerce intercourse ends. Carter v. Carter Coal Co., 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160 (1938); Wallace v. Currin, 95 F. 2d 856 (C.C.A.) (4th Cir. 1938).

Although the Commerce Clause authorizes Congress to regulate inter-state commerce directly it does not authorize Congress to regulate State Government regulation of interstate commerce pursuant to the necessary and proper clause or enlarge the specific jurisdiction of Federal Courts in Admiralty. Printz v. U.S., 521 U.S. 898, 117 S.Ct. 2865, 188 L.Ed. 2d 914 (1997); Oseredzuk v. Warner Co, 354 F. Supp. 453, 1972 A.M.C. 2007 (E.D. Pa. 1972) Affd. ; Doran v. Lee, 287 F. Supp. 807 (W.D. Pa. 1968).


In order for an act of Congress to supersede a State Statute, the consent must be direct and positive, so that the two acts cannot be reconciled or consistently stand together. Huron Portland Cement Co. v. City of Detroit Mich., 362 U.S. 440 S.Ct. 813, 4 L.Ed. 2d 852 1 Env't Rep. Cas. (BNA) 1016, 78 A.L.R. 2d 1294 (1960).

The criminal procedure Process was nearly sixty (60) days within it's Due Process in presenting criminal charges against Pro Se Defendant where under the Constitution Defendant has a Right to a Speedy and Public Trial, by and an impartial jury of the State and District wherein the crime shall have been committed, as well, the Defendant nor be deprived of life, liberty, or property without Due Process of law. The Circuit Court of Illinois within the County of Winnebago had begun proceedings to bring charges and presentment

of indictment under 720 ILCS 5/18-2 and was sixty (60) days within that process before this matter was unconstitutionally interrupted and placed under federal jurisdiction which can only be viewed as vindictive prosecution. This Honorable Court must examine it's jurisdiction and determine if the unconstitutional transfer of these young men over to federal jurisdiction was solely based on race. The Court must determine if the amount of individuals turned over by the State of Illinois to the Federal Government is equally proportion to the overall spectrum and not just targeting African Americans. In the Courts re-evaluation of jurisdiction, the main unanswered question the Court must consider is that Pro Se Defendant Charles O. Eubanks is twenty (20) years of age with no extensive criminal background or history, that warrants the State of Illinois to relinquish jurisdiction unconstitutionally over to the federal government, with full intent and purpose none other than to extract from this venture a lengthy sentence for crimes within the State of Illinois, where the federal government has no vested interest in the property, person(s), or land where alleged crimes occurred, where said acts are municipally legislated within the State of Illinois, where he was born, resides, and where reported robberies occurred.

Pursuant to 15A Am Jur 2d § 29. The States retain exclusive control over that commerce which is completely internal, which is carried on between one person and another in a state, and which does not extend to or affect other states. Katzenbach v. McClung, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed. 2d 290, 1 Empl. Prac. Dec. (CCH) ¶9713 (1964); W.J Seufert Land Co. v. National Restuarant Supply Co. 266 OR. 92, 511 P. 2d 363 (1973); U.S. v. Harrington, 108 F. 3d 1460 (D.C. Cir. 1997); State v. Jacksonville Terminal Co., 96 Fla. 295, 117

(6)

SO. 869, 59 A.L.R. 324 (1928); <u>Western Union Telegraph Co. v. Lee</u>,
174 Ky. 210, 192 S.W. 70 (1917); <u>Ingram v. Hughes</u>, 170 S.C. 1, 169
S.E. 425, 87 A.L.R. 1325 (1933).

A contract of sale between citizens of different states is not a
subject of interstate commerce merely because it was negotiated
between citizens of different states or by the agent of a company
in another state when the agreement itself is to be completed and
carried out wholly within the borders of a state. <u>Ware & Leland v.</u>
<u>Mobile County</u>, 209 U.S. 405, 28 S.Ct. 526, 52 L.Ed. 855 (1908);
<u>People v. Cole</u>, 187 Cal. App. 2d Supp. 847, 9 Cal. Rptr. 788 (Super
Ct. 1960). a transaction does not lose its intrastate status because
the total activities from which the local transaction derives may
have incidental interstate attributes. <u>Department of Treasury of</u>
<u>State of Indiana v. Wood Preserving Corp.</u>, 313 U.S. 62, 61 S.Ct.
885, 85 L.Ed. 1188 (1941); <u>Martin Ship Service Co. v. City of Los</u>
<u>Angeles</u>, 208 P. 2d 389 (Cal. App. 2d Dist, 1949); <u>Gross Income Tax</u>
<u>Division v. W.B. Conkey Co.</u>, 228 Ind. 352, 90 N.E. 2d 805 (1950).
However for taxation purposes at least, the purpose of the goods
in one state and their subsequent transportation to another state
does not, in and of itself render the sales transaction interstate
commerce. <u>McGoldrick v. Berwind-White Coal Mining Co.</u>, 309 U.S. 33,
60 S.Ct. 388, 84 L.Ed. 565, 128 A.L.R. 876 (1940); <u>Mcleod v. J.E.</u>
<u>Dilworth Co.</u>, 205 Ark. 780 171 S.W. 2d 62 (1943); <u>Nippert v. City</u>
<u>of Richmond</u>, 327 U.S. 416, 66 S.Ct. 586, 90 L.Ed. 760, 162 A.L.R.
844 (1946); <u>City of Clifton v. Weber</u>, 84 N.J. Super. 333, 202 A. 2d
186 (App. Div. 1964)

   <u>Fort Leavenworth R. Co. v. Lowe</u>, 114 U.S. 525, S.Ct. 995 (1885)

"in essence, these cases among many others, hold that
jurisdiction of any particular State is co-extensive
with it's borders or territory, and all persons and
property located or found therein are subject to
such jurisdiction, this jurisdiction is superior."

The federal government has no police power. In June 1957 the
government of the United States published a work entitled; "Juris-
diction over Federal Areas within the States"; Report of the Inter-
departmental Committee for the study of jurisdiction over federal
areas within the states, Part II, therein the committee stated;
"the Constitution gives express recognition to but by one means of
federal acquisition of legislative jurisdiction by state consent
under Article I § 8 Clause 17. Justice McLean suggested that the
Constitution provided the sole mode for transfer of jurisdiction
and that if this mode is not pursued, no transfer can take place."
Id. at 41. "it scarcely needs to be said that unless there has been
a transfer of jurisdction (1) pursuant to Clause 17 by a federal
acquisition of land with state consent, or (2) by cession from the
State to the Federal Government, or unless the Federal Government
has reserved jurisdiction upon the admission of the State the
federal government possesses no legislative jurisdiction over any
areas within a state, such jurisdiction being exercised by the state
subject to non-interference by the state with federal functions."
Id. at 45. "on the other hand, while the federal government has power
under various provisions of the Constitution to define and prohibit
as criminal, certain acts or omissions occurring anywhere in the
United States, it has no power to punish for various other crimes,
jurisdiction over which is retained by the State under our Federal
State system of government, unless such crimes occur on areas as to
which legislative jurisdiction has been vested in the Federal Government."

(8)

Id. at 107. United States v. Lopez, 115 S.Ct. 1624 131 L.Ed. 2d 626
57 CLR 2033 (1995).

Pursuant to 15A Am Jur § 55. The transportation of a product
from one state to another pursuant to the operation of a retail
business in the latter state does not indicate that a retail dealer
is engaged in interstate commerce and thus, purchases made outside of a
state of products sold within the state do not change the character
of ones business from intrastate to interstate, when such purchases
are merely incidental to ones principal business. Mitchell v. Clowser,
153 W. Va. 552, 170 S.E. 2d 753 (1969).

It is a well established principle of law that all federal
legislative applies only within territorial jurisdiction of the
United States unless a contrary  intent appears". See Caha v. United
States, 152 U.S. 211, 215,  14 S.Ct. 513 (1894); American Banana Co.
v. United Fruit Co., 213 U.S. 347, 357, 29 S.Ct. 511 (1909); United
States v. Bowman, 260 U.S. 94, 97,98, 43 S.Ct. 39 (1922); Blackmer
v. United States, 284 U.S. 421, 437, 52 S.Ct. 252 (1932); Foley
Bros. v. Filardo, 336 U.S. 281, 285, 69 69 S.Ct. 575 (1949); United
States v. Spelar, 338 U.S. 217, 222, 70 S.Ct. 10 (1949); and United
States v. First National City Bank, 321 F. 2d 14, 23 (2nd Cir. 1963)
and this principle of law is expressed in a number of cases from
Appellate Courts; See Mckeel v. Islamic Republic of Iran, 722 F. 2d
 582, 589 (9th Cir. 1983)(holding that Foreign Sovereign Immunities
Act as territorial); Meredith v. United States, 330 F. 2d 9, 11
(9th Cir. 1964)(holding that Federal Tort Claims Act as territorial);
United States v. Cotroni, 527 F. 2d 708, 711 (2nd Cir. 1975)(holding
that the Wiretaps Law as territorial); Thomas v. Brown & Root Inc.,
745 F. 2d 279, 281 (4th Cir. 1984)(holding same as Cleary, Supra);

(9)

Pfeiffer v. Wiiliam Wrigley Jr. Co., 755 F. 2d 534, 557 (7th Cir.
1985)(holding that Age Discrimination Laws as territorial).

Pursuant to 15A Am Jur § 62. Contracts by brokers for the sale of
products or commodities for future delivery. when the transactions
are closed by contracts completed in one state, although the orders
are received from another state are not the subject of interstate
commerce. Dickson v. Uhlmann Grain Co., 288 U.S., 53 S.Ct. 362, 77
L.Ed. 691, 83 A.L.R. 492 (1933).

Pursuant to 15A Am Jur § 76. The determination of whether goods
are transported in interstate commerce looks to whether the entire
transportation was continuous. Centruy Indem Co. v. Carlson, 133 F.
3d 591 (1998). Intent, while not alone conclusive is probably the
most important single determinant of continuous. U.S. v. Erie R. Co.,
280 U.S. 9850 S.Ct. 51, 74 L.Ed. 187 (1929); Chicago M. St. P&P R.
Co. v. Campbell River Mills Co., 53 F. 2d 69 (C.C.A. 9th Cir. 1931)
Pennsylvania R. Co. v. Public Utilities Commission of Ohio, 298 U.S.
170, 56 S.Ct. 687, 80 L.Ed. 1130 (1936).

As to Count fourteen (14) and all subsequent counts in the indictment
relating to Pro Se Defendant Charles O. Eubanks, it is evident and
a matter of fact that Soto's Jewelry Store located at 1126 South
Main Street, Rockford, Illinois is a licensed retail store incorp-
orated to do business in the State of Illinois, within the County
of Winnebago, which sells jewelry and that the date of August 2,
2007 the day the store was reported robbed had merchandise, goods
and/or articles put on display in the store for sale.

As to Count twelve (12) and all subsequent counts in the indictment
relating to Pro Se Defendant Charles O. Eubanks, it is evident and
a matter of fact that Englewood Beauty Supply located at 515 Marc-
hesano Drive, Rockford, Illinois, is a licensed retail store inco-

rporated to do business in the State of Illinois within the County
of Winnebago, which sells merchandise in the State of Illinois within
the City of Rockford, and that the date of July 31, 2007 the day
the business was reported robbed had merchandise, goods and/or ar-
ticles put up on display in the store for sale.

As to Count ten (10) and all subsequent counts in the indictment
relating to Pro Se Defendant Charles O. Eubanks, it is evident and
a matter of fact that R.B.'s Auto Sales located at 2701 11th Street,
Rockford, Illinois is a licensed used car store incorporated to do
business in the State of Illinois within the County of Winnebago,
which sells used cars within the State of Illinois within the City
of Rockford, and that the date of July 27, 2007 the day the business
was reported robbed, had used cars, merchandise, goods, and/or articles
put up on display in the store for sale.

As to Count eight (8) and all subsequent counts relating to
Pro Se Defendant Charles O. Eubanks, it is evident and a matter of
fact that Victory Lane Auto's located at 2805 11th Street, Rockford,
Illinois is a licensed used car  store, incorporated to do business
in the State of Illinois within the County of Winnebago, which sells
used cars within the State of Illinois within the City of Rockford
and that the date of July 20, 2007, the day the business was reported
robbed had used cars, merchandise, goods, and/or articles put up on
display in that store for sale.

Pursuant to 15A Am Jur § 67. Termination of protection afforded
by the Original Package Doctrine ceases if;
1) The imported article is sold even though the merchandise is in
   the hands of the purchaser remains in the original package.
2) The container is opened and smaller packages removed therefrom

(11)

and offered for sale.

3) The original packages are put up for sale and so dealt with as
   to make them apart of the common mass of the property.

4) The recipient of the packages has an unexecuted intention to
   reopen it and sell the contents.

Pursuant to 15A Am Jur § 69. "the beginning of the transit
constitute interstate commerce, is the time at which and article
is started on it's passage. This is when the article have been de-
livered or tendered to a common carrier for export although on a
local bill of lading". See Federal Compress & Warehouse Co. v. McLean,
291 U.S. 17, 54 S.Ct., 267 78 L.Ed. 622 (1934); Missouri K&T Ry. Co.
v. Ashinger, 1916 Ok. 1043, 63 OKLA. 120. 162 F. 814 (1916); Hammer
v. Dagenhart, 247 U.S. 251, 38 S.Ct. 529, 62 L.Ed. 1101, 3 A.L.R.
649 (1918)where a truck carrying a load to a purchaser in interstate
commerce and on its return trip after having completed the load is
incidental to interstate commerce.

Where it is a well known fact that the purported articles that
could be considered apart of the interstate spectrum had clearly
traveled and came to rest, where the interstate characteristics had
ceased and therefore been terminated to exist, where it is known
as a matter of obvious knowledge that the merchandise, goods, and/
or articles were plainly put up within each of the specific busin-
esse(s) within the State of Illinois within the County of Winnebago,
and City of Rockford, on display for sale at the reported time of
robberies, where interstate commerce had cease to exist at the time
of said robberies to each of the listed retail stores.

Pursuant to 15A Am Jur § 72. Interstate Commerce ordinarily
continues until it reaches the point where the parties originally

intended the movement of the merchandise, goods, or articles should finally end. In other words, the transportation of the goods usually is not complete until the shipment arrives at the point of destination and is there delivered. See Brown v. Maryland, 25 U.S. 419 (1827); Binderup v. Pathe Exchange Inc., 263 U.S. 291, 44 S.Ct. 96, L.Ed. 308 (1923); Gambino v. Jackson, 150 W. Va. 145 s.e. 2d 124 (1965); Low v. Austin, 80 U.S. 29 (1872)

The regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States. U.S.C.A Const. Art. I § 8 Cl. 3, U.S. v. Morrison, 120 S.Ct. 1740, 146 L.Ed. 2d 658, 144 Ed. Law Rep. 28 (U.S. 2000)

Pursuant to 15A Am Jur § 84. Congress may not regulate every matter pertaining to interstate commerce' for example, it cannot regulate matters between two private parties or transaction in which States act as a market participants, such as when it manufactures and sell products in the private sector, although Congress power is broad and sweeping it is not a general police power, such a general power is reserved to the State. See Brzonkala v. Virginia Polytechnic Institute and State University, 169 F. 3d 820, 136 Ed. Law Rep. 15 (4th Cir. 1999); U.S. v. Brown, 74 F. Supp. 2d 637 (N.D. W. Va. 1998); U.S. v. Lankford, 196 F. 3d 563 (5th Cir. 1999).

Crimes directed toward and individual violates the Hobbs Act, which prohibits interference with commerce by threats or violence only if;
1) the acts deplete the assets of an individual who is directly and customarily (as a matter of habit) engage in interstate commerce.

2) the acts cause or create the likelihood that the individual will
   deplete assets of an entity engaged in interstate commerce, or
3) the number of individuals victimized or the sum at stake is so
   large that there will be some cumulative effect on interstate
   commerce.

Under the "deplete the assets theory" the Federal Government
need only show a de minimis nexus on how acts affected interstate
commerce and to insure that a fair and honest impartiality to this
rule has been shown, "all" businesse(s) in relation to the instant
offense must as a matter of tradition in Hobb Act Cases, the owner
or manager must take the stand and testify that business robbed deals
directly and customarily in interstate commerce.

Pro Se Defendant Charles O. Eubanks contends that the Federal
Government has failed to have owners or managers of said businesse(s)
that were reported robbed testify before a grand jury or before this
Honorable Court that there businesse(s) engage in interstate commerce,
where the above three (3) point prong have been satisfied minus any
stretch of authority to garnish jurisdiction under this act, where
the mere presentment of charges and/or indictment without jurisdiction
doesn't justify jurisdiction where the Federal Government's indictment
has failed to meet the three point prong relating to Pro Se Defendants
Charles O. Eubanks alleged robberies.

Lastly in Glidden v. Zdanok, 370 U.S. 530 (1962) at 719; "that
judges who might be confirmed for other Courts, might "never pass
muster for onerous and life-or-death duties of Article III judges.
The standard procedure today is for a state citizen without federal
criminal liability, to be subjected to federal "so called" indictment
"so called" trial, before an Article I or Article IV Court without

(14)

criminal jurisdiction, without territorial jurisdiction, without
personal jurisdiction, without subject jurisdiction on issues without
legislative jurisdition, is absence of judicial jurisdiction and
in violation of the "exclusive jurisdiction" of the State wherein
citizen resides."

The Supreme Court held;

> "it is as much the duty of Government
> to render prompt justice against itself...
> in favor of citizens, as it is to
> administer the same between private
> individuals." Glidden Supra, at 689 (Emphasis Added)

The Pro Se Defendant Charles O. Eubanks was never fully apprised
of his Constitutional and Statutory Rights by counsel, regarding
his indictment and subsequent plea, his attorney of record never
fully investigated and/or disclosed whether the listed businesse(s)
were licensed and incorporated to do business with the Secretary
of State for the State of Illinois, nor did attorney of record
explain clearly the full spectrum in regard to purported interstate
commerce charges, rendering the plea unknowing and involuntary, because
had Pro Se Defendant Charles O. Eubanks been fully apprised he would
of never taken the plea, and it is because of this lack of knowledge
of intelligently explained plea on behalf of counsels ineffectiveness,
the plea is unconstitutional therefore rendering said plea null and
void. That any sentence imposed would be unconstitutional, and any
Judgment entered therefrom would be a void Judgment and Commitment
Order. A Judgment and Commitment Order that was signed without ju-
risdiction. A judgment and Commitment Order that would be unequitable.
A judgment and Commitment Order that would be unenforceable under
Article II of the United States Constitution.

## CONCLUSION

WHEREFORE, for the above stated reasons Pro Se Defendant Charles
O. Eubanks moves this Honorable Court to protect his Constitutional
Rights by vacating and setting aside the plea aggrement. I So Pray.

RESPECTFULLY SUBMITTED

_____
Charles O. Eubanks Pro Se

## CERTIFICATE OF SERVICE

I, CHARLES O. EUBANKS, Pro Se Defendant in the aboved cause
certify that I caused two (2) copies of (Affidavit in support of
motion to withdraw plea, and Motion to withdraw plea) via delivered
by U.S. Postage Mail and/or hand delivered to the Clerk of the
United States District Court for the Northern District of Illinois
this_____day of _____, 2008.

RESPECTFULLY SUBMITTED

_____
Charles O. Eubanks Pro Se

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOI

(5)

EXHIBIT - D

| | |
|---|---|
| CHARLES O. EUBANKS,<br><br>          Petitioner,<br><br><br>v.<br><br><br><br>UNITED STATES OF AMERICA,<br>          Respondent. | )<br>)<br>)<br>)  Case No. 07-CR-50058-1<br>)<br>)<br>)<br>) |

MOTION TO SUPPLEMENT THE MOTION

TO WITHDRAW PLEA PURSUANT

TO FED. R. CRIM. PROC.

12(b)(2)

NOW COMES, CHARLES O. EUBANKS, Petitioner in aid of the constitution before this Court requesting Judicial Notice pursuant to Rule 12(b)(2) of the Fed. R. Crim. Proc. , which permits this Honorable Court to Notice a Jurisdictional Challenge, "at any time during the pendency of the proceedings." See United States v. Wolff, 241 F. 3d 1055, 1056-57 (8th Cir. 2001).

Motion to withdraw the plea is in fact challenging this Honorable Courts jurisdiction to prosecute in this cause, and this Petitioner hereby request that all proceedings be postponed to allow this Honorable Court to adjudicate the facts of said motion.

(1)

CERTIFICATE OF SERVICE

I, CHARLES O. EUBAKS, hereby certify that all copie(s) of the aforementioned (Motion to supplement motion to withdraw plea pursuant to 12(b)(2)) to be forwarded to the Clerk of the United States District Court for the Northern District of Illinois via United States Postal Service prepaid this_____day of _____,2008.


RESPECTFULLY SUBMITTED

CHARLES O. EUBANKS Petitioner

(2)

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTICT OF ILLINOIS

(5)

Exhibit - E

CHARLES O. EUBANKS,
          Petitioner,

                  )
                  )
                  )
                  )   Case No. 07 CR-50085-1

v.

                  )
                  )
                  )
                  )

UNITED STATES OF AMERICA,
          Respondant.

## MOTION FOR APPOINTMENT OF

## INDEPENDENT INVESTIGATOR

NOW COMES, Charles O. Eubanks petitioner, petitions in good faith and in the matter of justice and the public reputation of the judicial process, moves this Honorable court to appoint an independent ivestigator from the University of Illinois at Chicago and/or any surrounding educational institutes of like qualification as the Court may deem appropriate to do an extensive investigation on how many State of Illinois criminal cases, that were relinquished over to the Federal Government for Federal Prosecution, where the Court will determine the following;

1) The age of the State Citizens.

2) The purported crimes by the State Citizens.

3) If there is a monetary scheme, where the State of Illinois receives

government funds for the relinquishing of State Citizens over to the federal government for federal prosecution and imprisonment.

4) What are the disparities between European State Citizens and African American State Citizens, that are relinquished over to the federal government for federal prosecution and imprisonment.

5) How many of these criminal cases involving the disparity of race, are relinquished from the State of Illinois over to the federal government for federal prosecution and imprisonment, on a yearly basis.

6) Petitioner moves this Honorable Court to specifically compel the Federal Government as well as the State of Illinois to show cause under what United States Constitutional Amendment or Statute and under whose authorization, are these individuals turned over to the Federal Government for federal prosecution and imprisonment.

WHEREFORE, upon the completion of this independent investigation, the facts that the federal and state governments systematic exclusions are conclusively revealed are true, then this Honorable Court is compelled to utilize it's vested power to insure that the selection process is fair and equal in how these State Criminal cases are chosen, and that they aren't motivated or manipulated solely based upon race, and upon the Court finding that this selection process is greatly one-sided, then the petitioner moves this Honorable Court to utilize it's vested power to right this constitutional and civil wrong in a fair equitable balance of justice, thereby changing the way this injustice is meted out upon a specific race/group of State Citizens Constitutional rights guaranteed in the Amendments of the Constitution.

RESPECTFULLY SUBMITTED

Charles O. Eubanks

## CERTIFICATE OF SERVICE

I, Charles O. Eubanks, petitioner in the above entitled cause certify that I caused three (3) copies of (Motion for appointment of independent investigator) to be sent via U.S. Postage Mail and/or hand delivered to the Clerk of the United States District Court for the Northern District of Illinois this _____ day of _____ 2008.

Respectfully Submitted

Charles O. Eubanks

(3)

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

(5)

EXHIBIT-F

| | |
|---|---|
| CHARLES O. EUBANKS, | ) |
| Pro Se Defendant, | ) |
| | ) |
| | ) Case No. 07 CR-50058-1 |
| v. | ) |
| | ) |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| Respondant. | ) |

AMICUS CURIAE MOTION

In good faith and in the interest of justice and the public re-
putation of the judicial process, moves this Honorable Court to make
the Court aware of the following;

1) That I, Charles D. Spears, am the father of the defendant Charles
   O. Eubanks.

2) That me and my son have approved correspondence. (See Attached)

3) That I've had an opportunity to read the entered plea agreement in
   it's entirety.

4) That my son Charles O. Eubanks have sent me two (2) letters professing
   that he only waived his right to go to trial, and not waived his
   appeal rights. ( See letters marked as Exhibit (A) and (B)).

5) Where in the plea agreement, that I've read he not only waived his

(1)

appeal rights, but he also waived <u>all</u> collateral attack on appeal
as well.

6) It appear your honor that he may of gave the Court the impression,
that he understood what the Court had conveyed to him at the plea
hearing, when he actually didn't understand fully, because he honestly
believes he still has his appeal rights, which can only render the
the entered plea unknowing, unintelligently, and involuntary.

7) Which can only leave one to conclude that either counsel of record
failed to explain fully in laymen terms the direct and indirect
consequences regarding all aspects of the entered plea or the def-
endant didn't fully understand what the Court explained to him at
the plea hearing under Federal Rule of Criminal Procedure Rule 11.


WHERERFORE, in light of the above information and reasons,
and in the interest of justice, I ask that this Honorable Court grant
motion to withdraw the entered guilty plea.


RESPECTFULLY SUBMITTED

Charles D. Spears #12480-424
F.C.I. Oxford
P.O. Box 1000
Oxford, WI 53952

## CERTIFICATE OF SERVICE

I, Charles D. Spears, certify that I am a friend of the court in the above entitled cause, and that I caused three (3) copies of (Amicus Curiae Motion) to be sent via U.S. Postage Mail and/or hand delivered to the Clerk of the United States District Court for the Northern District of Illinois this _____day of _____, 2008.

RESPECTFULLY SUBMITTED

Charles D. Spears #12480-424
F.C.I. Oxford
P.O. Box 1000
Oxford, WI 53952



**U.S. Department of Justice**

Federal Bureau of Prisons

*Federal Correctional Institution*

March 3, 2008

P.O. Box 0500
Oxford, Wisconsin 53952

Wendy Kerwin, Jail Administrator
Ogle County Jail
105 S. 5th Street
Oregon, IL 61061

RE:    REQUEST FOR INMATE CORRESPONDENCE PRIVILEGES

OUR:  SPEARS, Charles              YOUR: EUBANKS, Charles
Reg. No.: 12480-424               Doc No.: 1204765

Dear Ms. Kerwin:

Inmate Charles Spears has requested permission to correspond with his son,
Charles Eubanks, who is currently confined at your facility.

The Bureau of Prisons' policy, which governs inmate correspondence, stipulates that the
Wardens of both institutions must approve correspondence privileges between confined
inmates before permitting an inmate in a federal institution to correspond with an inmate
in any other correctional institution. In addition, records must verify that the inmates are
immediate family members. We have verified these two individuals are father and son;
therefore, we have no objections to their corresponding, should you also approve.

Please forward to me your approval or disapproval regarding correspondence privileges
between these two individuals. Thank you in advance for your consideration in this
matter.

Sincerely,

Carol Holinka
Warden

Approved  X                        Disapproved _____

Capt. Wendy Kerwin                 3/18/08
Wendy Kerwin, Jail Administrator   Date

EXHIBIT A    Dated: 7-6-08

Shat it do pops,

the only thing I can Appeal Is my Sentencing I need some advance

EXHIBIT B    Dated: 7-15-08

~~to you, and make sure you get it,~~ I didn't waive my rights to appeal my sentence, I waived my trial rights thats it dad, ~~I don't~~

~~okay, well I love you~~

Love Always your Baby Boy

1st Chauncy L. Luck Jr.

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Philip G. Reinhard | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 07 CR 50058 | **DATE** | 8/13/2008 |
| **CASE TITLE** | United States vs. Eubanks | | |

**DOCKET ENTRY TEXT:**

The "amicus curiae motion" submitted by defendant's father and related to defendant's motion to withdraw his guilty plea is stricken as it is not impartial, see Leigh v. Engle, 535 F. Supp. 418, 420 (N.D. Ill 1982), and is otherwise unhelpful to the court, see Voices for Choices v. Illinois Bell Telephone Co., 339 F. 3d 542, 544 (7th Cir. 2003).

*Philip G. Reinhard*

Notices mailed by Judicial staff.

5
Exhibit-F

| | Courtroom Deputy Initials: | LC |
|---|---|---|

Order Form (01/2005)

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Philip G. Reinhard | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 07 CR 50058 | **DATE** | 8/18/2008 |
| **CASE TITLE** | U.S.A. vs. Charles Eubanks | | |

**DOCKET ENTRY TEXT:**

Defendant's pro se motion for appointment of an independent investigator is stricken as he is represented by counsel (see order dated 8/7/2008).

Philip G. Reinhard

Notices mailed by Judicial staff.

(5)

EXHIBIT - G

| | Courtroom Deputy Initials: | /SEC |
|---|---|---|

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOI

5

EXHIBIT - H

CHARLES O. EUBANKS,                          )
        Pro Se Petitioner,       )
                       )
                       )
                       )   Case No. 07-CR-50058-1
v.                                           )   Assigned to: Honorable Judge
                       )   Philip G. Reinhard
                       )
UNITED STATES OF AMERICA,                    )
        Respondent.              )

---

## MOTION TO SHOW CAUSE

---

NOW COMES, Charles O. Eubanks, the undersigned, Pro Se Petitioner, moves this Honorable Court to show cause to the following listed questions in order to protect petitioners constitutional rights and assure Charles O. Eubanks, a clear understanding of this Honorable Courts vested powers and jurisdiction:

(1)    That this Honorable Court show cause as to what Article of the Constitution does this Honorable Courts vested powers derive from?

(2)    That if no such constitutional vested powers exist, then show cause and describe what legislative statute does this Honorable Courts power derive from?

(3)    That if no such Statutory vested powers exist then show cause by what authority does this Honorable Court have to accept Plea

1

and impose a sentence and enter a legal judgment and commitment order of imprisonment?

4)    That this Honorable Court show cause as to whether petitioner Constitutional Rights are intact and Honored by this Honorable Court?

With All Due Respect

_____

Charles O. Eubanks

CERTIFICATE OF SERVICE

I, Charles O. Eubanks, Pro Se Petitioner in the above entitled action certify that I caused All copie(s) to be sent to the adverse parties (Motion to Show Cause), via U.S. Mail Postage PrePaid on this _____day of _____,2008.

With All Due Respect

_____

Charles O. Eubanks

2

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINO

(5)

EXHIBIT - I

| | |
|---|---|
| CHARLES O. EUBANKS,<br>                    Petitioner, | ) |
| | ) |
| | ) |
| | )   Case No. 07-CR-50058-1 |
| | ) |
| v. | ) |
| | ) |
| | ) |
| | ) |
| UNITED STATES OF AMERICA,<br>                    Respondent. | ) |

REQUEST FOR JUDICIAL NOTICE

PURSUANT TO FED. R. EVID. RULE 201(d)

AND TITLE 28 U.S.C.S. § 1331

NOW COMES, CHARLES O. EUBANKS, Petitioner in aid of the Constitution in the above entitled action, moves this Honorable Court to reconsider it's decision in Court Order dated 8/13/08, where Petitioners Motion for Appointment of an Independent Investigator is stricken because Petitioner is represented by counsel.

Petitioner now request a Judicial Notice of facts pursuant to Fed. R. Evid. Rule 201(d) and a Federal Question pursuant to Title 28 U.S.C.S. § 1331, where Petitioner moves this Court to administer an Independent Investigation regarding state citizens (Charles O. Eubanks) being transferred over to the Federal Government for

federal prosecution and imprisonment. Petitioner is asking the Court
to reconsider it's Order for the following reasons;

1) Petitioner has filed a formal complaint against counsel of record
   dated August 10, 2008.

2) The formal complaint filed against counsel of record presents
   a conflict of interest in case number 07-CR-50058-1

3) Petitioner has filed a Motion to Withdraw counsel of record
   with the District Court.

4) Petitioner prays that the District Court may take Judicial Notice
   and action upon the merits of Motion for an independent invest-
   igator in the interest of justice.

In view of these considerations, the regulation of Judicial
Notice of facts by the present rule extends only to adjudicative
facts. When a Court or Agency find facts concerning the immediate
parties (Charles O. Eubanks)"being singled out for prosecution among
others similarly situated and...the decision to prosecute was improperly
motivated." United States v. Mangieri, 694 F. 2d 1270, 1273 (D.C.
Cir. 1982). Improper motivation is a selection deliberately based
on "an unjustifiable standard, such as race, religion or other arbitrary
classification." United States v. Armstrong, 517 U.S. 456, 464 (1996)
(quoting Oyler v. Boyles, 368 U.S. 456 (1962)). Federcv v. United
States, 600 A. 2d 370 (D.C. 1991)(en banc), discusses in detail the
requirements for showing selective prosecution, including the
showing necessary to obtain discovery and an evidentiary hearing,--
who did what, where, when, how, and with what motive or intent--the
Court or Agency is performing an adjudicative function, and the facts
are conviently called adjudicative facts.

The Constitution of the United States is the Supreme Law of

the Land and Binds every Forum whether it derives its authority from a State or from the United States. Cook v. Moffat & Curtis, 46 U.S. 295, 12 L.Ed. 159 (1847); Dodge v. Woolsey, 59 U.S. 331, L.Ed. 401 (1855); Ex parte Siebold, 100 U.S. 371, 25 L.Ed. 717 (1879).

The District Court cannot use the excuse of counsel's representation to negate Petitioners Constitutional Rights and assertions of Constitutional Rights, because the Court has a duty to protect Petitioners Constitutional Rights pursuant to the Bill of Rights and the 5th Amendment of the United States Constitution.

WHEREFORE, for the reasons stated above Petitioner moves this Honorable Court to reconsider Petitioners Motion for Independent investigator and/or ask that this Court act on it's own volition to issue a Order where the facts will aid the Court to adjudicate the facts in the instant cause and in the interest of justice.

RESPECTFULLY SUBMITTED

CHARLES O. EUBANKS Petitioner

## CERTIFICATE OF SERVICE

I, CHARLES O. EUBANKS, hereby certify under the Penalty of Perjury that the aforementioned Motion (Request for Judicial Notice and a Federal Question) is true and correct to the best of my knowledge. See Title 28 U.S.C. § 1746 and Title 18 U.S.C. § 1621, and that I, CHARLES O. EUBANKS, caused all copie(s) to be sent to Clerk Office for the United States District Court for the Northern District of Illinois via United States Postal Service prepaid this _____ day of_____,2008.

RESPECTFULLY SUBMITTED

CHARLES O. EUBANKS Petitioner

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

5

EXHIBIT - 5

| | | |
|---|---|---|
| CHARLES O. EUBANKS, | ) | |
| Petitioner, | ) | |
| | ) | |
| | ) | Case No. 07-CR-50058-1 |
| v. | ) | Assigned to: Honorable Judge |
| | ) | Philip G. Reinhard |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| Respondant. | | |

## FIRST AMENDMENT PETITION

NOW into Court comes the undersigned Charles O. Eubanks, Pro Se petitioner hereinafter, referred to as petitioner and setforth his Constitutional Redress of Greivance stating that I Charles O. Eubanks is being illegally held in restraint of my liberty for the following reasons:

1) That the United States District Court lack jurisdiction because Title 18 U.S.C. , Public Law 80-772, which purported to be enacted into law was never properly enacted into law.

2) The petitioner a natural born citizen of this country with unalienable rights moves this Honorable Court pursuant to the First Amendment and Article I § 9 Cl.2, to resolve and adjudicate the Constitutional violation.

1

## I.   PRAYER FOR RELIEF

Petitioner request this Court to grant petition for writ of habeas
corpus and declare unconstitutional and void ab initio: (1) Public Law
80-772 which purported to enact Title 18, United States Code, Act of
June 25, 1948, Chapter 645, 62 Stat. 638 et seq., and (2) more speci-
fically, § 3231 thereof, 62 Stat. 826, which purported to confer upon
"the district courts of the United States...original jurisdiction...
of all offenses against the laws of the United States." These legisla-
tive Acts violated the Quorum, Bicameral and/or Presentment Clauses
mandated respectively by Article I, § 5, Cl. 1, and Article I, § 7,
Cl. 2 and 3, of the Constitution of the United States. The  federal
district court which rendered judgment and ordered commitment of
Petitioner (Charles O. Eubanks), under § 3231, lacked jurisdiction and
therefore, this respective judgment and commitment order is void ab
initio. To detain and imprison Petitioner (Charles O. Eubanks) under
void judgment and commitment order is unconstitutional and unlawful.
As such, Petitioner (Charles O. Eubanks) must be discharged from his
present illegal incarceration immediately.

## II.   JURISDICTION OF THIS COURT TO ISSUE ORIGINAL WRIT

"(F)ederal court (habeas) jurisdiction is conferred by the alle-
gation of an unconstitutional restraint" for which "(t)he jurisdictional
prerequisite is.... detention simpliciter". Fay v. Noia, 372 U.S. 391,
426, 430 (1963). "The Priviledge of the Writ of Habeas Corpus shall
not be suspended, unless when in cases of Rebellion or Invasion the
Public Safety may require it," Article I, §9, Cl. 2, U.S. Const.,

which necessarily impl(ies) judicial action." Fay v. Noia, 372 U.S.
at 406, quoting Ex parte Yerger, 75 U.S. (8WALL.) 85, 98-99 (1868).
When this clause "was written into the Federal Constitution it was
settled that the writ lay to test any restraint contrary to fundamental
law...embodied in the written Constitution." 372 U.S. at 405, 426 ("at
the time...habeas was available to remedy any kind of government res-
traint contrary to fundamental law"). "(A)t the absolute minimum, the
Suspension Clause protects the writ as it existed in 1789," INS v. St.
Cyr, 533 U.S. 289, 300 (2001), quoting Felkner v. Turpin, 518 U.S.
651, 663-664 (1996), which "encompassed detention based on errors of
law, including the erroneous application or interpretation of statutes"
and was available to "answer" "pure questions of law" like raised
herein. 533 U.S. at 303,305.

This Court has explicit jurisdiction to entertain and grant writ
of habeas corpus to address unconstitutional custody and restraint.
Whether the writ of habeas corpus may also be granted by the
Supreme Court..."). See also Article 1, §9, Cl.2 ("The Supreme Court...
may issue all writs necessary or appropriate in aid of (its) jurisdiction
and agreeable to the usages and principles of law."). In construing §
14 of the 1789 Judiciary Act, now impowers this Honorable Court to
recognized that an original writ of habeas corpus may be issued from the
United States Supreme Court as part of its appellate jurisdiction.
Ex parte Bollman, 8 U.S. (4 Cranch) 75, 94-95 (1807). Ex parte Yerger,
75 U.S. at 98-99; Ex parte Lange, 85 U.S. (18 WALL.) 163, 166 (1874)
(same); Ex parte Virginia, 100 U.S. 339, 341-343 (1880). Thus, this
Petition is properly before this Court to address the illegal restraints
raised herein.

3

### III. CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED

Article I, § 1, commands and declares that "(a)ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall  consist of a Senate and House of Representatives."

Article I, § 5, Cl. 1, commands, in relevant part, that "a Majority of each (House of Congress) shall constitute a Quorum to do Business," excepting therefrom permission to "adjourn from day to day" and "to compel Attendance of its Members, in such Manner, and under such Penalties as each House may provide."

Article I, § 7, Cl. 2, commands, in relevant part, that "(e)very Bill which shall have passed both Houses, shall, before it becomes a Law, be presented to the President of the United States."

Article I, § 7, Cl. 3, commands, in relevant part, that (e)very ...Resolution...to which the Concurrence of the Senate and House of Representatives may be necessary...shall be presented to the President of the United States; and before the Same shall take Effect, shall be approved by him, or being disapproved by him, shall be repassed by two thirds of the Senate and House of Representatives, according to the Rules and Limitations prescribed in the case of a Bill."

Title 1, United States Code, Section 106, Act of July 30, 1947, Chapter 388, Title I, Ch. 2 § 106, 61 Stat, 634, Pub.L. 80-278, provides, in relevant part, that "(w)hen (a) bill...shall have passed both Houses, it shall be printed and shall then be called the enrolled bill...and shall be signed by the presiding officers  of both Houses and sent to the President of the United States."

### IV.    STATEMENT OF FACTS

Petitioner has been indicted, convicted, and committed into Executive custody by order of United States District Court acting pursuant

4

to the grant of original jurisdiction purportedly created by Public
Law 80-772, Title 18, United States Code, Section 3231, by virtue of
the commitment order, Petitioner (Charles O. Eubanks) has been committed
into the custody of the Attorney General[1]. Due to a plea, See 18 U.S.C.
§ 4082(a) (repealed) and § 3621(a)(enacted Oct. 12, 1984, and effective
Nov. 1, 1987). In respect to immediate custodian.Petitioner Charles O.
Eubanks is now in the custody of Wendy Kerwin Jail Adminstrator for Ogle
County Jail 105 S. 5th St. Oregon, IL 61061, under case number  07-CR-
50058-1.

The text of the bill, H.R. 3190 as amended, which became Public
Law 80-772 (enacting Title 18, United States Code, and especially section
3231), was passed only by the Senate and never passed by the House of
Representatives. Moreover, that bill was never certified as enrolled,
and was surreptitiously signed by the Speaker of the House and President
pro tempore of the Senate under purported authority of a concurrent
resolution agreed to by a Congress denounced by President Truman  as
a "body dominated by men with a dangerous lust for power and privilege ,"
27 Encyclopedia Americana 175 (2005), without quorums of the respective
Houses sitting. Finally, that bill was mistakenly signed by the President
of the United States after it was misrepresented to him by solitary
Officers as a bill passed by Houses, which was impossible since no
Congress was in session.

For those reasons, Public Law 80-772 which purportedly enacted
Title 18, United States Code, Act of June 25, 1948, Chapter 654, 62
Stat. 638 et seq. and Section 3231 thereof, 62 Stat. 826, purporting

---

[1]        petitioner Charles O. Eubanks was initially indicted under a presentment
of charges pursuant to Illinois Compiled Statutes 5/18-2 and was held
within the Custody of Winnebago County Jail November 2007, before the
matter was relinquished to federal jurisdiction for federal prosecution
under case No. 07-CR-50058-1, where petitioner is being commited into the
custody of the Attorney General by way of Jail Admin. Wendy Kerwin for
Ogle County Jail

to confer upon "the district courts of the United States...original
jurisdiction...of all offenses against the laws of the United States"
violates Article I, § 5, Cl. 1, and Article I, § 7, Cl. 2 and 3, and
are therefore unconstitutional and void ab initio. The respective
district court, which acted against Petitioner, did so without jurisdiction,
such judgment and commitment order is void ab initio, and imprisonment
thereunder is fundamentally unconstitutional and unlawful.

A.          H.R. 3190 In The First Session Of The 80th Congress

H.R. 3190 was introduced and committed to the Committee of the
entire House of Representatives on the State of the Union of the First
Session of the 80th Congress entitled "Crimes and Criminal Procedure."
See House Report No. 304 (April 24, 1947), p.1 (App. 67). See also
94 Cong. Rec. D556-D557 (Daily Digest) (charting H.R. 3190) (App. 65-
66). H.R. 3190 differed from "five...bills which...preceded it...(be-
cause) it constitute(d) a revision, as well as a codification, of the
Federal Laws relating to crimes and criminal procedure." 93 Cong. Rec.
5048-5049 (May 12, 1947)(App. 45-46). The bill was intended (1) to
revise and compile all of the criminal law, (2) to "restate" and
"consolidate" "existing statutes," (3) to "repeal" "obsolete, superseded,
redundant and repetitious statutes."(4) to coordinate the Criminal Code
with the "Federal Rules of Criminal Procedure" formerly enacted, and
(5) to "clarify and harmonize" penalties of the "many acts" passed by
Congress which were found to be "almost identical." (id.) "The bill
was ordered to be engrossed and read a third time, was read a third
time, and passed" the House on May 12, 1947, id; Journal of the House
of Representatives ("House Journal"), May 12, 1947, pp.343-344 (App.
4-5); 94 Cong Rec. D556--D557 (showing H.R. 3190's only passage by the

House of Rep. on May 12, 1947), sent to the Senate and there "referrd
...to the Committee on the Judiciary." 93 Cong Rec. 5121, May 13, 1947
(App. 47); Journal of the Senate("Senate Journal"), May 13, 1947 . p 252
(App. 10)[2]

As passed and enrolled by the House of Representatives H.R. 3190
included at section 3231, Subtitled "District Courts" the following
text:

> Offenses against  the United States shall be cognizable in
> the district courts of the United States, but nothing in
> this title shall be held to take away or impair the jurisdiction
> of the courts of the several states under laws thereof.

H.R. 3190 as passed by the H. of Rep., p. 367 § 3231 (App. 110). see
United States v. Sasscer, 558 F. Supp. 33, 34 (D. MD. 1982).

On July 27, 1947, Congress adjourned without the Senate passing
H.R. 3190. See 93 Cong. Rec.10439, 10522 (July 26, 1947)(App. 48-49).
On November 17, 1947, Congress recovened pursuant to a Presidential
proclamation. Yet, Congress again "adjourned sine die on December 19,
1947," without the Senate passing H.R. 3190. Kennedy v. Sampson, 511
F. 2d 430, 444 Appendix n. 4 (D.C. Cir. 1974).

B.      H.R. 3190 In Second Session Of The 80th Congress

The Senate Committee on the Judiciary reported amendments to
H.R. 3190 on June 14, 1948, under Sen. Rep. No. 1620. 94 Cong. Rec.8075
(June 14, 1948)(App. 50); Senate Journal, June 14, 1948, p. 452 (App.
34)[3]. Sen. Rep. No. 1620 contained "a large volume of amendments" and
"the new Federal Rules of Criminal Procedure (were) keyed to the bill
and (were) reflected in part II of (the new proposed) title 18."

---

[2]      The Senate Journal for May 13, 1947, was approved by the Senate on
May 14, 1947, Senate Journal, p. 259 (App. 11), and the House Journal for
May 12, 1947, was approved by the House on May 13, 1947, House Journal,
p. 346 (App.6 ). The Journal of the two Houses are admissable as evidence
when properly certified. 28 U.S.C. § 1736. See also House Doc. No. 355 59th
Cong, 2nd Sess, Hind's Precedents of the House of Representatives, § 2810
p. 34 (G.P.O. 1907)("Certified extracts of the Journal are admitted in

Heralding that, upon passage of the amended bill, "(u)ncertainty will
be ended," the Senate wanted "the amendments adopted en bloc,' including
a new jurisdictional section for Title 18. 94 Cong. Rec. 8721 (App. 51).
The report contained only the proposed amendments. See Sen Rep.No. 1620,
pp. 1 & 4 (App. 103-104).

"(T)he amendments were considered and agreed to en bloc" and then
"ordered to be  engrossed." 94 Cong. Rec. 8721-8722 (June 18, 1948)(App.
51-52), Senate Journal, June 18, 1948, p. 506 (H.R. 3190, "as amended,"
passed the Senate)(App. 37). It was moved that "the Senate insist upon
its amendments" by the House (94 Cong. Rec.  at 8722); and "(o)rdered
that the Secretary request the concurrence of the House of Representatives
in the amendments." Senate Journal, supra,p. 506 House Journal, June 18,
1948, p. 688 (App. 16).

The House received the proposed amendments. The Clerk "read the
Senate  amendments" collectively into the record with which the House
concurred. 94 Cong. Rec.8864-8865 (June 18, 1948)(App. 53-54); House
Journal, June 18, 1948, p. 704 (the "said Senate amendments were concurred
in")(App. 17). Although "(t)he House agreed to the amendments to...H.R.
3190," Senate Journal, June 18, 1948, p. 510 (App. 38), no action was
taken on H.R. 3190 as amended.[4] The Journal of the House of Representatives
is devoid of any vote on H.R. 3190 itself on June 18, 1948, and there-
after through adjourment on June 20, 1948. Moreover, the official histo-
rical chart of H.R. 3190 clearly shows the only passage by the House
of Representatives occurring on May 12, 1947, and specifically references
volume 93, page 5048 of the Congressional Record as the recorded date the
House passed the bill. 94 Cong. Rec. D556-D557 (Daily Digest).

---

[2] the courts of the United States") (App. 85). Cf. Fed, R. Evid. Rule
902(5); see 28 U.S.C. § 2072(a) and (b).
[3]    The Senate approved its journal for June 14, 1948. Senate Journal
June 15, 1948 ,pp461-462 (App. 35-36).

C.   Congress Agreed by Resolution To Continue Legislative Business
     By A Single Officer Of Each House During Adjournment

On June 19, 1948, the House submitted and agreed to concurrent
resolutions H. Con. Res. 218 and 219 and requested concurrence by the
Senate. House Journal, June 19, 1948, pp. 771-772 (App. 19-20); Senate
Journal, June 18, 1948, p. 577 (App. 39). "(T)he Senate (then) passed
without amendment these concurrent resolutions of the House."[5] 94 Cong.
Rec. 9329 (App. 57). H. Con. Res. 218 "provid(ed) adjournment of the
two Houses of Congress until December 31, 1948," id. see Concurrent
Resolutions,Second Session, Eightieth Cong. H.Con. Res. 218, June 20,
1948, 62 Stat. 1435-1436 (App. 105-106). H.Con.Res. 219 "authoriz(ed)
the signing of enrolled bills following adjournment," 94 Cong. Rec.
9349, specifically resolving:

> That notwithstanding the adjournment of the two Houses
> until December 31, 1948, the Speaker of the HOuse of
> Representatives and the President pro tempore of the
> Senate be, and they are hereby, authorized to sign
> enrolled bills and joint resolutions duly passed by
> the two Houses and found truly enrolled.

See Concurrent Resolutions, supra H.Con.Res. 219, June 20, 1948 62 Stat. 1436.

Congress adjourned on June 20, 1948, pursuant to H.Con.Res. 218.
94 Cong. Rec. 9348, 9169 (App. 55,56);House Journal, June 20, 1948,
p. 775; Senate Journal,June 20, 1948, p. 578 (App. 40). Both Houses
reconvened on July 26, 1948, pursuant to a proclamation of President
Truman. Senate Journal, July 26, 1948, p. 593 (showing reconvention);
House Journal, July 26, 1948, pp. 792-793(same).[6]

D.   Post-Adjournment Signing Of H.R. 3190 By Single Officers Of

---

4    The House approved the Journal for June 18, 1948 House Journal, p 714
(June 19, 1948, approving Journal for "legislative day of ...June 17, 1948"-
i.e., calendar day of June 18, 1948) (App. 18);id at p. 669 (showing
Friday, June 18, 1948, as "legislative day of Thursday June 17, 1948")
(App. 15), and the Senate approved its Journal for June 18, 19, and 20

The Houses And Presentment To And Approval Thereof By The
President Pursuant To H.Con.Res. 219

With both Houses adjourned with no quorum, disassembled and dis-
persed, Mr. LeCompte, the Chairman of the Committee on House Administration
reported that, that committee had found H.R. 3190 "truly enrolled."
House Journal, legislative day of June 19, 1948, p. 776 (recorded under
"BILLS AND JOINT RESOLUTIONS ENROLLED SUBSEQUENT TO ADJOURNMENT")(App. 22).[7]
He attached his certificate of enrollment to the original H.R. 3190
passed by the House on May 12, 1947. See H.R. 3190. certified after
adjournment as "truly enrolled"(as certified by Richard H. Hunt, Director,
Center for Legislative Archives, The National Archives, Washington D.C.)
(App. 107-113). Although never certified as truly enrolled, the Speaker
and the President pro tempore respectively signed the Senate's amended
H.R. 3190 on June 22 and 23 1948. 94 Cong. Rec. 9353-9354 (App.58-59);
House Journal, legislative day June 19, 1948, p. 777 (App.23); Senate
Journal, legislative day June 18, 1948, pp. 578-579 (App. 40-41).
National Archives & Records Adm. Cert. H.R. 3190 signed by House and
Senate officers and President Truman (App. 114-117). The Senate's amended
H.R. 3190 was then presented by the committee on House Administration
to President Truman, on June 23, 1948, who signed it on June 25, 1948[8],
at 12:23 P.M. E.D.T., 94 Cong. Rec.9364-9367 (App. 61-64); House Journal
legislative day of June 19, 1948, pp. 778, 780-782 (App. 24,25-27);
Senate Journal, legislative day of June 18, 1948, pp. 579,583 (App. 41,
43). National Archives & Records Adm. Cert., H.R. 3190, supra; 94 Cong.
Rec. D557 (Daily Digest).

---

4       1948 Senate Journal, July 26, 1948, p. 593 (App. 44).

E.  The Signatories Of H.R. 3190 Knew The Enacting Clause Was
    False When Signed

Public Law 80-772 stated that the enactment proceeded "by the
Senate and House of Representatives of the United States of America
in Congress assembled." See National Archives & Records Adm. Cert..
H.R. 3190 as signed into P.L. 80-772, supra. Each signatory knew that
neither "House" legislatively existed at that time, and that the legislative
process had ceased within the terms of Article I, §§ 5 and 7 on June
20, 1948.

### V.  REASONS FOR GRANTING WRITS

A.  The Exceptional Circumstances And Constitutional Effect's
    Mandates That Application be Made To The Respective District Court

This case potentially affects We the people of America,
by challenging the district court's jurisdiction to adjudicate every
federal criminal offense coming before them pursuant to 18 U.S.C. §
3231. The effects will reach matters of national and international
concern involving the integrity of the legislative and judicial branches.
Finally, federal district court judges have a potential conflict of
interest precluding them from hearing the claims presented by 28 U.S.C.
§ 455 and Due Process of Law.

Although not "political questions" in themselves and resolvable
by the federal courts, INS v. Chadha, 462 U.S. 919, 940-943(1983), they

---

5    The House sat from June 19 through June 20, 1948, adjourning at 6:56
A.M., House Journal, June 19, 1948, p. 775 (App. 21), and approved the
Journal of the 19th. House Journal, July 26, 1948, pp. 792-793(reconvention
by Presidential Proclamation)(App. 28-29).
6    The House Journal for July 26, 1948, was approved, House Journal,
July 27, 1948, p. 797 (App. 30), and the Senate Journal for July 26, 1948
was approved. Senate Journal, July 27, 1948, p. 593 (App. 44).

carry "significant political overtones" or "political implications"
upon "which depend public and private interests of vast magnitude."
Id. 462 U.S. at 942 and 943 (citing Marbury v. Madison, 5 U.S. (1 Cranch)
137 (1803) and quoting Marshall Field & Co. v. Clark, 143 U.S. 649,
669-670 (1892).

This Court has discretion to hear this petition in the first instance.
See Article 1, §9,Cl.2. See, e.g. Ex parte Abernathy, 320 U.S. 210 (1943)
(Per Curiam). Although such discretion is "sparingly" exercised,now is the
time because...this case presents factors which compel exercise of this courts
discretion:namely, the interests involved; the significant impact of
the issues; and the preservation of the integrity of the Judicial
Branch of government. See Sunal v. Large 332 U.S. 174, 178-180 (1947)
(exemplifying "exceptional circumstances"); Ex parte Grossman, 267 U.S.
87, 108, 121 (1925) (determining scope of President's pardon power
presents "(e)xceptional case"; New York v. Eno, 155 U.S. 89, 93-97 (1894)
(explaining "exceptions" as "case of urgency, involving the authority
and operation of the government"). See also Ex parte Hudgings, 249 U.S.
378,379-380 (1919) ("exception" standard to general rule prohibiting
by-passing "other available sources of judicial power" and to determine
if the case is "of such exceptional character" depends "upon and analysis
of the merits"): United States ex rel. Norris v. Swope ___U.S.___, 96
L.Ed. 1381, 1382 (1952) (Justice Douglas in chambers).

---

7      Mr. LeCompte's announcement was reported upon reconvention by
the President's Proclamation on July 26, 1948, 94 Cong. Rec. 9363
(App.60).
8      That same day President Truman signed into law Public Law 80-773
enacting into positive law Title 28 United States Code. Act of June
25, 1948, Ch. 646 § 1, 62 Stat. 869. That Act positively repealed the
former criminal jurisdiction granted to the district courts. id. § 39
et seq., 62 Stat. 991 et seq. (positive repeal listing former 28 U.S.C.
§ 41, ¶ 2 in schedule of repealed statutes).

An act of Congress "does not become a law unless it follows each and every procedural step charted in Article I, § 7 Cl. 2 of the Constitution." Landgraf v. USI Film Products, 511 U.S. 244, 263 (1994) (citing INS v. Chadha, 462 U.S. at 946-951 (emphasis added)): Clinton 524 U.S. at 448 (noting requisite "steps" taken before bill may "become a law" and holding that a procedurally defective enactment cannot "become a law" pursuant to the procedures designed by the Framers of Article I, § 7, of the Constitution").

The Constitution requires "three procedural steps": (1) a bill containing its exact text was approved by a majority of the Members of the House of Representatives; (2) the Senate approved precisely the same text; and (3) that text was signed into law by the President. "If one paragraph of that text had been omitted at any of those three stages, (the law (in question) would not have been validly enacted."[9] Clinton, 524 U.S. at 448 (emphasis added). Between the second and third "procedural steps"  "the bill"...shall...be presented to the President..." Article I, § 7, Cl. 2

The text of H.R. 3190 passed by  the House of Representatives was the text as it existed on the date of passage i.e. May 12, 1947. Whereas, the text of the bill passed by the Senate on June 18, 1948, was H.R. 3190 "as amended"." Senate Journal, June 18, 1948, p. 506. Thus, the text of the bills passed by the respective Houses was grossly different and neither bill ever "became a law." Clinton, 524 U.S. at 448.

---

9    "All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." Art. I § 1 of the Constitution.
    "...(A) Majority of each (House) shall constitute a Quorum to do Business..." Art. I, § 5, Cl. 1.
    "Every Bill which shall have passed (both Houses), shall before it becomes a Law, be presented to the President of the United States, if he approves it..." Art. I, § 7, Cl. 2.
    "Every...Resolution...to which the Concurrence of (both Houses) may be necessary (except on a question of Adjournment) shall be presented to the

B.  Permitting Post-Adjournment Legislative Business Pursuant To
    H.Con.Res.219 Violated The Quorum, Bicameral and Presentment
    Requirements Of Article I Of The Constitution

After Congress adjourned on June 20, 1948, pursuant to H.Con.Res.
219, a single officer of each House of Congress signed a bill purporting
to be H.R. 3190 on June 22-23, 1948, 94 Cong. Rec. 9354; House Journal,
legislative day of June 19, 1948, p. 777; Senate Journal, legislative
day of June 18, 1948, pp. 578-579, and presented that bill to the
President, who signed it on June 25, 1948. 94 Cong. Rec. 9365-9367.
Thus, the post-adjournment signatures "provisions (of H.Con.Res. 219)
was an important part of the legislative scheme," leading to the
enactment of Public Law 80-772, without which it would never have "be-
come a Law." Bowsher v. Synar, 478 U.S. 714, 728 (1986). Public Law
80-772 falsely stated it was "enacted" while both Houses were "in
Congress assembled," when in fact Congress was not in session. See
National Archives & Records Adm. Cert. H.R. 3190 as signed into P.L.
80-772.

The bill was the Senate's amended H.R. 3190- a bill never certified
as "truly enrolled," compare Pub. L. 80-772, Enactment Clause & signature
pages with H.R. 3190, certified as "truly enrolled." supra and H.Con.Res.
219 never authorized the signing of unenrolled bills after adjournment.
See H.Con.Res. 219, supra, 62 Stat. 1436.

---

9 President of the United States; and before the Same shall take Effect,
shall be approved by him,,," Art. § 7, Cl. 3.

14

Article I, § 5, Cl. 1 mandates a quorum of both Houses of Congress "to do Business." This constitutional requirement has been enforced by practice, Rules of the Houses, custom, Supreme Court holdings and duly enacted statutes.

1 U.S.C. § 101 requires every "enacting clause of all Acts of Congress" to state: "Be it enacted by the Senate and House of Representatives of the Unites States of America in Congress assembled." Although the bill after passage by "both Houses" must be "enrolled" following which it shall be signed by the presiding officers of both Houses and sent to the President of the United States,"[10] 1 U.S.C. § 106, the actual procedure is regulated by House rules and established practices. Following passage the "chairman of the Committee on House Administration...affixes to the bills examined a certificate that the bill has been found truly enrolled,"[11] House Doc. No. 769, supra, Stages of a bill, § 983, No. 16, p. (483)(App. 79), after which the "enrolled bill is first laid before the House of Representatives and signed by the Speaker... after which it is transmitted to the Senate and signed by the President of that body." id. No. 17, p. (484)[12] (App. 80).

The Supreme Court in Marshall Field & Co. v. Clark, 143 U.S. 649 (1892), defined the essence of this procedure:

> The signing by the Speaker of the House of
> Representatives, and by the President of the

---

[10]    1 U.S.C. § 106 contains an exception for enrollment "(d)uring the last six days of a session," but no exception for enrolling, signing, or presenting a bill to the President otherwise than during the sitting of both Houses.

[11]    Formerly, the "chairman of the Committee on Enrolled Bills" performed this critical task in the legislative business of enacting a bill, which has always required the enrolled bill to be "placed before the House and signed by the Speaker." See House Doc. No. 355 59th Cong., 2nd Sess., Hinds Precedents of the House of Representatives, Ch.XCI, § 3429, notes 3 & 5, p. 311 (G.P.O. 1907)(App.92). See House Doc. No. 769, supra, Preface, p. (VI) ("The rulings of the Speakers of the House and of the Chairman of the Committee of the Whole are to the rules of the House what the decisions of the courts are to the statutes..(which are) embodied in

> Senate, in open session, of an enrolled bill
> is an official attestation by the two houses
> of such bill as one that has passed Congress.
> It is a declaration by the two houses, through
> their presiding officers, to the President,
> that a bill, thus attested, has received, in
> due form, the sanction of the legislative branch
> of the government, and that it is delivered
> to him in obedience to the constitutional
> requirement that all bills which pass Congress
> shall be presented to him.

143 U.S. at 672 (emphasis added). 1 U.S.C. § 106 codified this implicit

constitutional requirement. Reading 1 U.S.C. §§ 101 and 106 together

requires that all acts must occur at least through presentment to the

President while Congress is in session. That the enrolled bill must be

"layed before the House" prior to signing by the Speaker and then

"transmitted to the Senate" before the signing by the President of that

body concludes that the respective Houses must be in session during

this transaction.[13]

An "adjournment terminates the legislative existence of Congress."

Pocket Veto Case, 279 U.S. at 681. "Th(e) expression, a "house" or

"each house." (when) employed...with reference to the faculties and

powers of the two chambers...always means...the constitutional quorum,

assembled for the transaction of business, and capable of transacting

business." 279 U.S. at 683, quoting I Curtis Constitutional History

of the United States, 486 n.1. moreover the term "Houses" means "the

---

11    monumental work(s) of Hinds and Canon.")(App.71)

12    The Supreme Court not only takes judicial notes of the legislative
history of a bill, Alaska v. American Can Co., 358 U.S. 224, 226-227 (1959),
but will both judicially notice and "h(o)ld" Congress and its legislative
committees "to observance of its rules." Yellin v. United States, 374 U.S.
109, 114 (1963).

16

House in session," 279 U.S. at 682 and "as organized and entitled to exert legislative power" that is, the legislative bodies, "organized conformably to law for the purpose of enacting legislation." id (quoting Missouri Pacific Railway Co. v. Kansas, 248 U.S. 276, 281 (1919). See also House Doc. No. 355, supra, Hinds Precedents, § 2939, p. 87 ("The House is not a House without quorum")(App. 87)

No "attestation" or "declaration by the two houses...to the President," Field & Co., 143 U.S. at 672, that H.R. 3190 had "passed" Congress during the adjournment was possible because no such "houses" constitutionally existed. See also United States National Bank of Oregon v. Independent Insurance Agents of America, 508 U.S. 439, 455 n. 7 (1993)(noting that the rule established in Field & Co., 143 U.S. at 672, made statutory by 1 U.S.C. § 106 turned upon " the enrolled bill " signed in open session by the Speaker of the House of Representatives and the President of the Senate"). Longstanding precedence of the House affirms this. House Doc. No. 355, supra, Hinds Precedents, Vol. IV, § 2951, pp 90-91 (upon "disclos(ure)...that there is not a quorum...(t)he House thereby becomes constitutionally disqualified to do further business")(excepting from disqualification the exceptions stated in Art. I, § 5, Cl. 1)( emphasis added)(App. 88-89); id, § 3458, p. 322 ("The Speaker may not sign an enrolled bill in the absence of a quorum.")(App. 93); id. at § 3486, pp. 332-333 ( recognizing enrollment and presentment to the

---

13    "(T)he Constitution has left it to Congress to determine how a bill is to be authenticated as having passed" and "the courts accept as passed all bills authenticated in the manner provided by Congress." United States v. Munoz-Flores, 495 U.S. 385, 391 n. 4 (1990)(citing Marshall Field & Co. v. Clark, 143 U.S. 649 (1892), in which case the Courts established the so-called "enrolled bill rule"- a rule not applicable in this case, but a ruling that supports Petitioner claims.)

President to be legislative business required to be completed before adjournment)(App. 95-96); id, at § 3487, p. 333 n. 3 (presentment to the President is legislative "business" which must be completed before adjournment)(App. 96); id, at § 4788, p. 1026 ("The presentation of enrolled bills" to the President of the United States is a "transact(ion)" of "business" of the "House.")(App. 100).

Once a bill has passed the House of Representatives it must be printed as an "engrossed bill" which then "shall be signed by the Clerk of the House...sent to the other House, and in that form shall be dealt with by that House and its officers, and , if passed, returned signed by said Clerk." 1 U.S.C. § 106. In the immediate case H.R. 3190 was passed by the House of Representatives on May 12, 1947, engrossed and sent to the Senate and there referred to the Senate's Committee on the judiciary. See 93 Cong. Rec. 5048-5049, 5121; Senate Journal, May 13, 1947, p. 252. However, it was not dealt with nor passed "in that form."

Instead, amendments were proposed which were "agreed to en bloc," read into the record and "ordered to be engrossed," 94 Cong. Rec. 8721-8722. Then, "the (amended) bill was read the third time and passed." 94 Cong. Rec.8722; Senate Journal, June 18, 1948, p. 506. The House then concurred in the amendments en bloc. 94 Cong. Rec. 8864-8865; House Journal, June 18, 1948, p. 704. [14]

"The HOuse in which a bill originates enrolls it," House Doc. No. 769, supra, Stages of a Bill, No. 15, p. (483)(App. 79), and, in the

---

[14]     This contravenes the procedures of the House of Representatives for the 80th Congress. "When a bill with Senate Amendments, comes before the House, the House takes up each amendment by itself..." House Doc. No. 759, Stages of a Bill in the House, § 983, No. 13, p. (483).

case of House bills, the "chairman of the Committee on House Administ-
ration...affixes to the bills examined a certificate that the bill has
been found truly enrolled," id. No. 16, p. (483), after which it is
"laid before the House...signed by the Speaker (then) transmitted to
the Senate and signed by the President of that body." id. No. 17, p.
(484). unequivocally, "(t)he Speaker may not sign an enrolled bill in
the absence of a quorum." House Doc. No. 355, supra, Hinds Precedent,
§ 3458, p. 322. Cf., id., § 2939, p. 87 ("The House is not a House without
quorum.").

The constitutional "quorum" issue is precluded from the Field
& Co.'s "enrolled bill rule" by its terms-i.e., "(t)he signing...in
open session, of an enrolled bill," 143 U.S. at 672 (emphasis added),
which in any case only applies in "the absence of (a) constitutional
requirement binding Congress." United States v. Munoz-Flores, supra
495 U.S. at 391 n. 4. Moreover, just as "§ 7 gives effect to all of
its Clauses in determining what procedures the Legislative and Executive
Branches must follow to enact a law," id, 495 U.S. 386 (emphasis by
Court), so too does Article I, § 5, Cl. 1 "provid(e) that no law could
take effect without the concurrence of the prescribed majority of the
Members of both Houses," INS v. Chadha, 462 U.S. at 949-950, as to all
legislative "Business." Cf. United States v. Ballin, 144 U.S. 1, 3-5
(1892)(to determine whether constitutionally mandated quorum was
present for legislative action the Court "assume(s)" the Journals of
the Houses are to be considered to decide the issue).

The bill signed by the Officers of the Houses presented to and
signed by the President of the United States was the Senate's amended
bill, which never passed the House. H.Con.Res. 219 only "authorized
(the) sign(ing) (of) enrolled bills...duly passed by the two Houses

and found truly enrolled," H. Con. Res. 219, supra, 62 Stat. 1436, voiding the signatures on the amended bill.[15]

Having not been enrolled, certified as truly enrolled, or signed by the Speaker of the House with a quorum present, the bill was rendered constitutionally void. House Doc. No. 769, supra, Constitution of the United States, § 55, p. (19)("(w)hen action requiring a quorum was taken inthe ascertained absence of a quorum...the action was null and void")(App. 74); House Doc. No. 355, supra, Hinds Precedents, §§ 3497, 3498, pp. 344-345 (such a bill is "not in force" and is "not a valid statute")(App. 97-98). Cf., id., Hinds Precedents, § 2962, p. 94 (to vacate legislative act "the absence of a quorum should appear from the Journal")(App. 90).

Art. I, § 7, mandates that a bill that has passed both Houses "shall before it becomes a Law, be presented to the President of the United States...," Art. I, § 7, Cl. 2; INS v. Chadha, 462 U.S. at 945, which "can only contemplate a presentment by the Congress in some manner, (because)...(a)t that point the bill is necessarily in the hands of the Congress." United States v. Kapsalis, 214 F. 2d 677, 680 (7th. Cir. 1954), cert. denied, 349 U.S. 906 (1955)(emphasis added). Thus, presentment is clearly part of the legislative procedure required as essential to enactment of a bill as law. INS v. Chadha, 462 U.S. at 945, 947, 951; La Abra Silver Mining Co. v. United States, 175 U.S. 423, 454

---

15    On July 26, 1948, "Mr. LeCompte, from the Committee on House Administration, reported that, that committee had examined and found" that H.R. 3190 had been "truly enrolled." 94 Cong. Rec. 9363. The version of H.R. 3190 certified as "truly enrolled" by Mr. LeCompte, is the House version passed on May 12, 1947, with the text of the original § 3231-the text of which was never passed by the Senate-to which his certificate of enrollment is attached. (App. 107-113). The Statutory mandate after final passage and printing to "call" the bill in such final form "the enrolled bill," 1 U.S.C. § 106, Act of July 30, 1947, Ch. 388, Ch. 2, 61 Stat. 634, is determined by the certificate "affixe(d) to the bill," House Doc. No. 769, Stages of a Bill, supra, No. 16, all of which is required before the "sign(ing) by the presiding officers of both Houses and sen(ding) to the President of the United States." 1 U.S.C. § 106.

(1899)("After a bill has been presented to the President, no further
action is required by Congress in respect of that bill, unless it be
disapproved by him...")(emphasis added). See House Doc. No. 355, supra,
Hinds Precedents. Vol. IV, § 4788, p. 1026 (recognizing that "presentation
of enrolled bills" to the President is a "transact(ion)" of "business"
of "the House"): id., § 3486, p. 332 (recognizing presentment required
prior to adjournment); id., § 3487, p. 333 note 3 (when bill is enrolled
or signed by presiding officers "too late to be presented to the President
before adjournment" signing and presentment must continue at next session
as a "resumption of (legislative  business"). Clearly presentment is
part of the constitutionally mandated "Business," Art. I, § 5, Cl. 1,
to be "exercised in accord with (the) single, finely wrought and exhaus-
tively considered, procedure" "prescri(bed)...Art. 1, §§ 1, 7." INS
v. Chadha, 462 U.S. at 951.

    The "draftmen" of the Constitution "took special pains to assure
these (legislative) requirements could not be circumvented. During the
final debates on Art. I, § 7, Cl. 2, James Madison expressed concern
that it might easily be evaded by the simple expedient of calling a
proposal a 'resolution' or 'vote' rather than a 'bill.' As a consequence,
Art. I, § 7, Cl. 3...was added." INS v. Chadha 462 U.S. at 947( citing
2 Farrand, supra, 301,302, 304-305).

    Whether actions authorized under a resolution are "an exercise
of legislative powers depends not on their form but upon 'whether they
contain matter which is properly to be regarded as legislative in its
character and effect." INS v. Chadha, 462 U.S. at 952 (quoting S. Rep.
No. 1335, 54th Cong. 2d Sess., 8 (1897). "if the power is legislative,
Congress must exercise it in conformity with the bicameralism and

and presentment requirements of Art. I, § 7." Metropolitan, 501 U.S.
at 276. See also Bowsher v. Synar, 478 U.S. at 756 (Stevens, J., con-
curring)("it is settled, however, that if a resolution is intended to
make policy that will bind the Nation, and thus is 'legislative in its
character and effect,' S. Rep. No. 1335, 54th Cong. 2d Sess. 8, (1897)-
then the full Article I requirements must be observed. For 'the nature
or substance of the resolution, and not its form, controls the question
of its disposition.' Ibid.").

     "Congress," of course, "cannot grant to an officer under its
control what it does not possess." Metropolitan, 501 U.S. at 275 (quoting
Bowsher v. Synar, 478 U.S. at 726). Congress does not possess the
"capab(ility) of transacting business" and is not "entitled to exert
legislative power," when its "legislative existence" has been "termi-
nate(d)" by an "adjournment." Pocket Veto Case, 279 U.S. at 681-683
(citations omitted). "The limitation of the power of less than a quorum
is absolute," House Doc. No. 355, supra, Hinds Precedents, Vol. V, Ch.
CXL, § 6686, p. 851 (App. 102), and includes the signing of an enrolled
bill by the Speaker of the House, id., Vol. IV, Ch. XCL, § 3458, p.322,
and presentment to the President of the United States. id., Ch. XCIL,
§§ 3486, 3487, & 3497, pp. 332, 333 note 3, 344 & 345 (App. 95-98).
Wright v. United States, 302 U.S. 583, 600 (1938)( Stone, J concurring)
("The houses of Congress, being collective bodies, transacting their
routine business by majority action are capable of acting only when in
session and by formal action recorded in their respective journals, or
by recognition, through such action, of an established practice.")
Thus, "Congress," as defined by the Constitution and Supreme Court,
never "presented" any  version of H.R. 3190 to the President of the
United States.

Whether the action taken under H. Con. Res. 219 was an "exercise
of legislative power" depends upon whether it was essentially "legis-
lative in purpose and effect." INS v. Chadha, 462 U.S. at 952. "in
short, when Congress '(takes) action that ha(s) the purpose and effect
of altering the legal rights, duties, and relations of persons...outside
the Legislative Branch,' it must take that action by the procedures
authorized in the Constitution." Metropolitan, 501 U.S. at 276, quoting
INS v. Chadha, 462 U.S. at 952-955. "If Congress chooses to use a
resolution...as a means of expediting action, it may do so, if it acts
by both houses and presents the resolution to the President," Consumer
Energy Council of America v. F.E.R.C., 673 F. 2d 425, 476 (D.C. Cir.
1982), Aff'd mem. sub nom. Process Gas Consumers Group v. Consumer Energy
Council of America, 463 U.S. at 1216 (1983).

The inescapable conlusions as to the "purpose and effect" of H.
Con.Res. 219 was to enact a bill the text of which at the time of adjourn-
ment on June 20, 1948, had not been passed by both Houses, enrolled,
certified as "truly enrolled," or signed by the officers of the Houses
or presented to the President of the United States with quorums sitting.
In other words, H.Con.Res.219 unconstitutionally permitted post-adjo-
urnment legislative business to proceed without Congress and upon an
unpassed bill. Congress did not follow the procedures mandated by Art.
I, § 7, Cl. 2 and attempted to supersede the quorum requirements of
Art. I, § 5, Cl. 1 via a concurrent resolution to carry forth legislative
business with no legislature. The 80th Congress surreptitiously provided
a bill, the text of which had never passed either House, "mask(ed)
under...(the) indirect measures," Metropolitan , supra, 501 U.S. at 277
(quoting Madison, The Federalist No. 48, p. 334 (J. Cooke 1961 ed.)),
of a resolution purporting to authorize continuing legislative action

during adjournment with no quorum and no Congress of an extra-congre-
ssional bill. Public Law 80-772 did not "become a Law" as required by
the constitutional procedures mandated under Article I, § 5, Cl. 1,
and Article I, § 7, Cls. 2 and 3, and is unconstitutional and void ab
initio.

"(W)hen action requiring a quorum was taken in the ascertained
absence of a quorum...the action (is) null and void, " House Doc. No.
769, supra, Constitution of the United States, § 55, p. (19)(citing
Hinds Precedents, Vol. IV, § 2964), and "a bill...not actully passed
(although) signed by the President (is to be) disregarded (requiring)
a new bill (to be) passed." House Doc. No. 769,§ 103, p. (34)(citing
Hinds Precedents, Vol. IV, § 3498)(App. 75).

    C.   THE DISTRICT COURT ORDER COMMITING PETITIONER TO EXECUTIVE
         CUSTODY PURSUANT TO § 3231 (OF THE UNCONSTITUTIONAL PUBLIC
         LAW 80-772 WERE ISSUED ULTRA VIRES, ARE UNCONSTITUTIONAL
         AND CORAM NON JUDICE, AND HIS IMPRISONMENT IS UNLAWFUL

"The challenge in this case goes to the subject-matter jurisdiction
of the (respective district) court and hence power to issue the order,"
United States Catholic Conference v. Abortion Rights Mobilization, Inc.,
487 U.S. 72, 77 (1988), committing Petitioner to imprisonment in
Executive custody. Thus, the "question is, whether...(the district court)
action is judicial or extra-judicial, with or without the authority
of law to render (the) Judgment," Rhode Island v. Massachusetts, 37 U.S.
(12 Pet.) 657, 718 (1838), and to issue the commitment order.

Subject-matter jurisdiction means "the courts' statutory or
constitutional power to adjudicate the case," United States v. Cotton,
535 U.S. 625, 630 (2002), quoting Steel Co. v. Citizens For A Better

Environment, 523 U.S. 83,89 (1998); Rhode Island v. Massachusetts, 37 U.S. (12 Pet.) at 718 ("Jurisdiction is the power to hear and determine the subject-matter in controversy between parties to a suit, to adjudicate or exercise any judicial power over them."); Reynolds v. Stockton , 140 U.S. 254, 268 (1891)("Jurisdiction may be defined to be the right to adjudicate concerning the subject matter in a given case."). "Subject-matter limitations on federal jurisdiction serve institutional interests by keeping the federal courts within the bounds the Constitution and Congress have prescribed." Ruhrgas AG v. Marathon Oil Co.526 U.S. 574, 583 (1999).[16]

"Without jurisdiction the court cannot proceed at all in any cause... and when it ceases to exist, the only function of the court is that of announcing the fact and dismissing the cause." Steel Co. v. Citizens, 523 U.S. at 94, quoting Ex parte McCardle, 74 U.S. (7 Wall) 506, 514 (1869); Willy v. Coastal Corp., 503 U.S. 131, 137 (1992)("lack of subject-matter jurisdiction...precludes further adjudication"). This Court has asserted over and over that "(t)he requirement that jurisdiction be established as a threshold matter 'spring(s) from the nature and limits of the judicial power of the United States' and is inflexible

---

[16]    "Federal courts are courts of limited jurisdiction...jurisdiction of the lower federal courts is further limited to those subjects encompassed within a statutory grant of jurisdiction." Insurance Corp. of Ireland Ltd. v. Compagnie des Bauxite de Guinea, 456 U.S. 694, 701 (1982); Kline v. Burke Constr. Co., 260 U.S. 226, 234 (1922)(all lower federal courts 'derive (their) jurisdiction wholly from the authority of Congress"); United States v. Hudson & Goodwin, 11 U.S. 32, 33 (1812)(federal courts possess no jurisdiction but what is given to them by the power that creates them.") United States v. Hall, 98 U.S. 343, 345 (1879)(federal courts possess no jurisdiction over crimes and offenses...except what is given to them by the power that created them"); Hudson & Goodwin, 11 U.S. at 33-34, See also e.g. United States v. Wiltberger, 18 U.S. 76, 95-105 (1820) ("the power of punishment is vested in the legislative, not the judicial department," criminal statutes are to be construed strictly,"probability" cannot serve to "enlarge a statute" and an offense not clearly within the terms of a statute precludes federal court jurisdiction).

and without exception." Steel Co., 523 U.S. 94-95, quoting Mansfield.
C. & L.M.R. Co. v. Swan, 111 U.S. 379, 382 (1884):See also Insurance
Corp. of Ireland. Ltd., 456 U.S. at 702.

Because subject-matter jurisdiction "involves a court's power
to hear a case, (and thus), can never be forfeited or waived...correction
(is mandatory) whether the error was raised in district court" or not.
United States v. Cotton, 535 U.S. at 630 (citation omitted); Steel Co.,
523 U.S. at 94-95(citing cases). When a district court did "not have
subject-matter jurisdiction over the underlying action...(its) process(es)
(are) void    an order of (punishment) based (thereupon)...must be
reversed." United States Catholic Conf.,487 U.S. at 77: Wily v. Coastal
Corp., 503 U.S. at 139 ("(T)he (punishment) order itself should fall
with a showing that the court was without authority to enter decree.);
Ex parte Fisk. 113 U.S. 713, 718 (1885)("When...a court of the United
States undertakes, by its process...to punish a man...(respecting) an
order which that court had no authority to make, the order itself, being
without jurisdiction, is void, and the order punishing...is equally void.")

Habeas corpus review "is limited to the examination of the jur-
isdiction of the court whose judgment of conviction is challenged."
INS v. St. Cyr,533 U.S. 289, 311-314 (2001); Bowen v. Johnston, 306 U.S.
19, 23 (1939). A "court.'has jurisdiction to render a particular judg-
ment only when the offense charged is within the class of offenses
placed by the law under its jurisdiction." 306 U.S. at 24 (emphasis
added). If it is found that the court lacked jurisdiction to try petitioner,
the judgment is void and the prisoner must be discharged. Ex parte Yarbrough,
110 U.S. 651, 654 (1884).

Petitioner Charles O. Eubanks have established that the text of
H.R.3190 signed by respective House officers and the President of the

United States: (1) failed to pass the House of Representatives, and
(2) that the legislative process continued after Congress adjourned
by single officers of each House acting pursuant to H.Con.Res. 219,
without quorums in either House, all of which violated Article I,
Section 5,Clause 1; Article I, Section 7, Clause 2, and/or Article I,
Section 7, Clause 3-and any of which rendered Public Law 80-772
unconstitutional and void ab initio. Marbury v. Madison, 5 U.S. 137,
180 (1803)("a law repugnant to the constitution is void; and...courts
as well as other departments, are bound by that instrument"). Therefore,
because "the offenses charged...were placed by the law under (the)
jurisdiction," of the respective district courts below pursuant to
18 U.S.C. § 3231 of Public Law 80-772, which is unconstitutional and
void, the court was/is without jurisdiction and the petitioner (Charles
O. Eubanks) must be discharged." Yarbrough, 110 U.S. at 654. Since Public
Law 80-772  has never been enacted as required by Article I, Section
5, Clause 1, and Article I, Section 7, Clause 2 and 3 thereof, rendering
void ab initio the jurisdiction by which the respective district court
acted to convict, enter judgment and order petitioner imprisoned in
Executive custody, the district court actions were "ultra vires,"
Ruhrgas AG, 526 U.S. at 583 (quoting Steel Co., 523 U.S. at 101-102),
and "coram non judice." Rhode Island v. Massachusetts, 37 U.S. (12 Pet.)
at 720.

   The conviction and judgment thereupon "being without jurisdiction
(are) void, and the order punishing...(are) equally void." Ex parte Fisk,
113 U.S. at 718; United States Cath. Conf.487 U.S. at 77; Wily v.
Coastal Corp., 503 U.S. at 139. This is precisely the office and function
of habeas corpus-i.e., to "examin(e)...the jurisdiction of the court

whose judgment of conviction is challenged," <u>Bowen v. Johnson</u>, 306 U.S. at 23 and where, as here, the court were clearly "without jurisdiction... the petitioner...must be discharged." <u>Ex parte Yarbrough</u>, 110 U.S. at 654. <u>See also</u> <u>Ex parte Lange</u>, 85 U.S. (18 Wall) 163, 166 (1874).

<u>CONCLUSION</u>

For these reasons, Petitioner (Charles O. Eubanks) pray that the said writ of habeas corpus be issued and that he be immediately discharged from his unlawful imprisonment.

RESPECTFULLY SUBMITTED

_____
Charles O. Eubanks Pro Se Petitioner

<u>CERTIFICATE OF SERVICE</u>

I, Charles O. Eubanks Pro Se Petitioner in the above action certify under Penalty of Perjury that the facts stated or alleged herein are true and correct pursuant to Title 28 U.S.C. § 1746, and the petitioner caused all copie(s) to be forwarded to all parties (First Amendment Petition) to be sent to the Clerk of the U.S. District Court for Northern District of Illinois, via U.S. Mail Pre-paid Postage at this institutions legal officer/mail box, this _____ day of _____, 2008.

RESPECTFULLY SUBMITTED

_____
Charles O. Eubanks
